998

**UNITED STATES ex rel. UNITED STATES LINES, on Behalf of COLOVIS v. WATKINS.**

No. 92, Docket 21131.

United States Court of Appeals
Second Circuit.

Dec. 3, 1948.

Delbert M. Tibbetts, of New York City (Kirlin, Campbell, Hickox & Keating, of New York City, on the brief), for relator-appellant.

William J. Sexton, Asst. U. S. Atty., of New York City (John F. X. McGohey, U. S. Atty., and Alvin Lieberman, Atty., U. S. Dept. of Justice, Immigration and Naturalization Service, both of New York City, on the brief), for respondent-appellee.

Before L. HAND, Chief Judge, and AUGUSTUS N. HAND and CLARK, Circuit Judges.

CLARK, Circuit Judge.

The United States Lines has sought a writ of habeas corpus to secure the release of Nick Colovis, a seaman in the United States merchant service now under detention for deportation as an alien. Colovis, a citizen of Greece, holds American seaman's papers issued by the United States Coast Guard, an American Social Security card, and an unexpired Greek passport. As a seaman on the S. S. "Thomas C. Power," operated by the United States Lines, he came into the port of Norfolk, Virginia, on April 8, 1948, where an Immigrant Inspector refused him admission to the United States and ordered him detained on board and deported as a "Malafide Seaman" under the regulations

applicable to alien seamen. 8 C.F.R., 1947 Supp., 120.21(e); and see also 8 U.S.C.A. §§ 167, 168. The ship was taken out of service for repairs; and on April 12, 1948, the Inspector sent Colovis to Ellis Island for detention at the expense of the United States Lines, as provided in 8 C.F.R., 1947 Supp., 120.36. The writ was issued in July, 1948; and attached to the respondent's return was a report by the Inspector to the Officer in Charge at Norfolk made on July 23, 1948. The parties stipulated that the case might be heard on this and the answer to it by affidavit on the part of the relator, together with the allegations of fact in the petition for the writ, which were admitted by the respondent. The court dismissed the writ, D.C.S.D.N.Y., 79 F.Supp. 101, and this appeal followed.

Since the Inspector's original notice to detain on board was merely of the formal nature stated above, the justification for the detention must therefore stand upon his more informal report made to his superior some three and a half months later. In this the Inspector points out that on the vessel's voyage from Italy the "subject alien" had become very quarrelsome and that on an occasion when he had been drinking heavily he leaped without warning on the carpenter and boatswain and stabbed them both a number of times. The report then continues and concludes:

"The Master, Chief Mate, Carpenter, Boatswain and several members of crew were questioned and all stated that they were afraid of Colovis and what he might do with a knife. Because of the actions of this alien he was questioned thoroughly to determine his admissibility to the United States.

"Among other things that Colovis admitted was the fact that he had no legal entry to the United States, yet claimed that his home was in Houston, Texas where he had stayed ashore for long periods of time and that he was married in that city. Because of these admissions it was doubted that Colovis would maintain the bonafide status of a seaman who could be allowed shore leave only while his vessel was in port. He was accordingly detained as malafide."

Colovis in his affidavit in reply states that he was married to Mrs. Sarah R. Marin, an American citizen, at Houston, Texas, on July 26, 1945, "and established my residence there at 1101½ Wooding Street, Houston, Texas, where I return as often as possible between voyages, as I often sail from or return to Southern ports." He then gives the details as to his voyages which we discuss below. He goes on to state that the Inspector asked him about the fight on board ship, to which he replied that he had been in a fight not because of any fault on his part or any threats by him, but that he was beaten by another member of the crew. He concludes: "The other things mentioned in his [the Inspector's] report must have been obtained from others, and they are not the true facts."

Since the facts of employment and alienage are clear, the issue under the regulations is therefore whether Colovis was "seeking to enter the United States temporarily solely in the pursuit of his calling as a seaman, with the intention of departing with the vessel or reshipping on board any other vessel for any foreign port or place," and was thus a "bona fide alien seaman." 8 C.F.R., 1947 Supp., 120.2; 8 U.S.C.A. § 203(5). This must be considered in the light of the further provision, § 120.21 (a), authorizing the examining immigrant inspector to grant alien seamen temporary admission for such time as he may designate, not to exceed the time the vessel remains in the United States and in no event to exceed 29 days. Subd. (b) allows the officer in charge at the port of arrival to grant an extension "if exceptional circumstances exist" up to 90 days, with a provision that any request for an extension beyond that period "shall be referred to the Central Office for decision." While these later provisions are not relied on here, they show the possibilities for somewhat extensive stays envisioned in the regulations.

It is agreed that the legality of the order for the seaman's detention may be tested by a writ of habeas corpus, United States ex rel. D'Istria v. Day, 2 Cir., 20 F. 2d 302; but the parties are at odds as to

whether or not he was entitled to a hearing before a Board of Special Inquiry under 8 U.S.C.A. §§ 166, 214. The relator relies on earlier precedent urged to be in point,[1] while the respondent cites cases such as British Empire Steam Nav. Co. v. Elting, 2 Cir., 74 F.2d 204, 206, certiorari denied 295 U.S. 736, 55 S.Ct. 648, 79 L.Ed. 1684; Lloyd Royal Belge Societe Anonyme v. Elting, 2 Cir., 61 F.2d 745, 746, certiorari denied 289 U.S. 730, 53 S.Ct. 526, 77 L.Ed. 1479; United States ex rel. D'Istria v. Day, supra, 2 Cir., 20 F.2d 302, 303; West Indian Co. v. Root, 3 Cir., 151 F.2d 493, 497, to show that the action of the Inspector in granting shore leave must be informal and immediate while on shipboard. But it is conceded that the action of the Inspector cannot be "arbitrary" or "capricious," compare The Navemar, D.C. E.D.N.Y., 41 F.Supp. 846; and under all the circumstances it seems to us it was just that.

As we shall point out, this was Colovis' ninth voyage after his marriage, with shore leaves interspersed among them. That at this late date and after so many leaves apparently freely granted an issue was made as to his leave here seems quite obviously a consequence of the fighting on shipboard; in fact, the Inspector says that because of this Colovis was "questioned thoroughly," etc. But such traditional pastimes of seamen, Kable v. United States, 2 Cir., 169 F.2d 90, 93; Aguilar v. Standard Oil Co. of New Jersey, 318 U.S. 724, 731, 63 S.Ct. 930, 87 L.Ed. 1107, while they may call for the discipline of the master or other punishment, are hardly subject to the inappropriate penalty of detention for deportation, with all the consequences of forfeiture of work and marital home here apparent. More specifically they seem to have little bearing upon the intent to reship. Possibly they suggest the desirability of another berth, procurement of which would be facilitated by shore leave; but this too appears but guesswork.

As to the marriage, that is certainly a fact to be considered; if coupled with illegally long stays ashore, as the Inspector seems to imply, it would of course be adequate to support his somewhat halting conclusion that "it was doubted" that Colovis would maintain the necessary bona fide status. But marriage might, on the other hand, be a steadying influence and might well cause a seaman to take extra precaution against jeopardizing his status by violating regulations. Any implication that a "home" in Houston is of itself inconsistent with the temporary character of a seaman's shore leave would seem unjustified; home for a seaman is naturally a place of less frequent and prolonged visitations than is home for a landsman. And the regulations, while they emphasize that entry is "temporarily" and "solely in the pursuit of his calling," make no express prohibition against visiting such home as a seaman may be able to establish. Indeed, one might well imagine such a visit to be much better preparation for reshipment than 29 days spent in a hotel, city, or other resort.

Be that as it may, it seems obvious that the search for his intent to reship or not is not very decisively aided by these factors in the abstract; what is more to the point is what they appear to have meant in this seaman's actual experience. The most significant factor appears to us therefore to have been his custom to violate or not to violate like leaves previously granted. And there appears to be no reason why his previous voyages and interspersed leaves could not have been easily verified—as by the Coast Guard certificates of discharge [2]—in the several days while

---

[1] Citing the decision of Judge L. Hand in United States ex rel. Filippini v. Day, D.C.S.D.N.Y., 18 F.2d 781, in preference to the later decision of the same judge in United States ex rel. Cateches v. Day, 2 Cir., 45 F.2d 142, the affirmance of which in 283 U.S. 51, 51 S.Ct. 359, 75 L.Ed. 835 was, it is urged, on another ground. A hearing, with right of administrative review, is accorded an alien seaman overstaying his leave against whom deportation proceedings are instituted under 8 C.F.R., 1947 Supp., 150.-11.

[2] These discharges, attached to Colovis' affidavit, generally substantiate his claims as to voyages made since 1945, with some slight discrepancies as to the date of shipment in certain cases and with one voyage on the S. S. "Thomas C. Power"

Colovis was held in Norfolk or in the several months while he was confined at Ellis Island. We think the Inspector's indefinite "long periods of time" ashore should therefore be examined in the light of the definite facts. And these show a generally increasing regard for the time limit of 29 days.

It is true that on Colovis' own affidavit there appears to have been a period of more than a year before February 8, 1945, when no voyage is claimed; whether actually he was without the country or employed on some foreign vessel or here illegally does not appear. But even if it were the latter, it is not punishment for past sins, but his present intent, which immediately concerns us. At any rate he was on a voyage from February 8 to July 16, 1945. Then followed his marriage, with reshipment delayed until at least November 9, 1945. This was overlong, but he asserts that he spent a short time in a Houston hospital for treatment of leg injuries sustained during the War and then was delayed in getting employment due to a maritime strike, being registered at the Greek consulate in New York for employment from September 24 on. His two voyages thereafter undertaken were separated by only a day's interval. Then in the summer of 1946 he was on shore from six weeks to slightly over two months;[3] but in the middle of this period he appears to have been in the hospital at Staten Island, New York, for eleven days for further treatment of his leg. The seven following voyages, including the last, showed very short leaves, well under 29 days, in all except two instances, where there was an excess of a few days. But here we must consider his unchallenged assertion that the date of shipment as shown by the Coast Guard certificates was not the actual date when he boarded the vessel, which in all cases was about ten days before he actually signed articles. Hence for some time and for several voyages there had been apparently no overstays of leave, and certainly none of any serious kind such as would suggest a definite intent to stay ashore.

While each new entry does not necessarily destroy the adverse impression to which an earlier overstay would naturally give rise, yet obviously the intent at issue is a present intent; and as to that his recent quite admirable record should be more illuminating than what he may have done in 1944 before his marriage. Having regard to the vicissitudes of re-employment which a seaman must face and the special difficulties involving hospitalization encountered by this man, it does seem quite unrealistic and discriminatory to hold that his actions showed him a fit subject for deportation as a "malafide seaman." In the light of these facts, which the Inspector should have considered, the Inspector's action must be held to have been arbitrary.

The order is reversed and the action is remanded with the direction that the writ be sustained.

---

unaccounted for, although it is covered by the affidavit made by an officer of the United States Lines. His explanation of the certificate dates and his assertion that in each instance he was actually on board ship ten days before signing articles is noted in the text.

[3] Here he puts his date of shipment as August 3, 1946, while the Coast Guard certificate gives it as August 23, 1946.