**UNITED STATES ex rel. WATTS v. SHAUGHNESSY, District Director of Immigration & Naturalization Service.**

United States District Court
S. D. New York.
Sept. 18, 1952.

614

Delson, Levin & Gordon, New York City, for relator.

Myles J. Lane, U. S. Atty., New York City, by William J. Sexton, Asst. U. S. Atty., New York City, for respondent.

IRVING R. KAUFMAN, District Judge.

This habeas corpus proceeding was instituted by Rowland Watts, who describes himself as a friend of relator and a representative of the Workers Defense League, which is said to be assisting aliens who would be subjected to physical persecution if deported to countries governed by totalitarian regimes.

Upon the argument of this application, the Court was advised by relator's counsel that no contention is being raised concerning relator's deportability or the fairness of the hearing he received pursuant to that portion of 8 U.S.C.A. 156(a), as amended by the Internal Security Act of 1950, which provides:

"No alien shall be deported under any provisions of this chapter to any country in which the Attorney General shall find that such alien would be subjected to physical persecution."

What is at issue here is whether a so-called finding by the Commissioner of Immigration and Naturalization concerning relator's persecution if deported to Spain was arbitrary, capricious and so unfounded in the evidence adduced at the hearing as to constitute a denial of due process of law.

For the past few years relator has been plying his trade as a seaman. He has entered the United States on several occasions at least two of which ended in his exclusion and deportation from this country. The last occasion which brought about the deportation proceedings on which the instant order to deport is based resulted from his entry into the country on or about February 11, 1952 at Blaine, Washington, without an inspection, passport or visa, as required by law.

Following his apprehension by the Immigration and Naturalization Service, relator was taken into custody pursuant to an immigration warrant duly issued on February 18, 1952. On February 20, 1952, he was given an administrative hearing to show cause why he should not be deported. The presiding officer at the hearing decided that relator be deported to which relator did not except although he was given the opportunity.

Thereafter the countries of relator's choice declined to accept him as a deportee as a result of which this Government completed plans for his deportation to Spain on May 1, 1952. Thereupon relator contended he would be subjected to physical persecution if deported to Spain and, following cancellation of deportation arrangements, a hearing was accorded him on May 29, 1952 at which he testified under oath before an officer of the Immigration and Naturalization Service and was represented by an attorney of his own choice. The record of relator's claim, together with the report of the Immigration Officer, was forwarded to the Commissioner of Immigration and Naturalization and on July 10, 1952, the Commissioner, as the Attorney General's representative, made an order stating

"* * * after review of the facts in this case, I do not find that if this alien is deported to Spain, he would be subjected to physical persecution."

The Government does not assert in its Return to the petition that the alien is not entitled to the protection of the Fifth Amendment of the Constitution. Instead, the contention is made that the hearing and the evaluation of the testimony were fair in all respects and that courts may not substitute their judicial opinions for those vested exclusively in the executive by statute.

The Fifth Amendment provides without qualification that no person shall "be deprived of life, liberty, or property, without due process of law". Judge Charles E. Clark, in discussing this provision in United States ex rel. Mezei v. Shaughnessy, 2 Cir., 1952, 195 F.2d 964, at page 967, stated:

"It is not confined to the protection of citizens; and its provisions, by definition, 'are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality.' Yick Wo v. Hopkins, 118 U.S. 356, 369, 6 S.Ct. 1064, 1070, 30 L.Ed. 220. They extend in fact to all whose presence here brings them within reach of the judicial and administrative processes of the United States Government. United States v. Pink, 315 U.S. 203, 228, 62 S.Ct. 552, 86 L.Ed. 796."

■ An alien who avails himself of a provision of law concerning a matter so vital that his very life and liberty may depend upon its just application is entitled to the thorough and surrounding protection of the Fifth Amendment. Any whittling away of this safeguard would enable the executive officer to treat cavalierly the provision under consideration, yet nowhere do I find, nor has the Government cited, any indication that the intention of Congress was to reduce the effectiveness of the Fifth Amendment in this area. The provision in question is, by strong analogy, consonant with our historic tradition of affording asylum to the persecuted, a tradition which reaches back beyond the birth of the Fifth Amendment itself.

■ The language of the provision under consideration does not expressly confer discretion on the Attorney General but in other parts of this subsection, the Attorney General is authorized to perform certain acts "in the discretion of the Attorney General". It would seem clear, therefore, that Congress was precise in its allocation of discretionary powers. It is also clear that a precondition of deportation cases such as this is a finding that there will not be persecution of the alien. This is a finding of fact and must be based on investigation which, in its method and in the formulation of the conclusion to which that investigation leads, must be fair and not arbitrary, reasoned and not capricious. The demands of the Fifth Amendment cannot be satisfied with less.

I have read with utmost care the testimony of the relator given at the hearing held before an investigator of the Immigration and Naturalization Service. Such a close reading is necessary in order to determine whether there has been an arbitrary evaluation and whether relator's claim that he would be subjected to physical persecution if deported to Spain is valid. Counsel for relator was a representative of the International Rescue Committee, an organization which had interested itself in the alien. The hearing established without contradiction that the International Refugee Organization had certified relator to be a refugee from Spain, and that the Legal Office of the Provisional Intergovernmental Committee for the Movement of Migrants from Europe, had determined him to be within the mandate eligible for Discretionary Resettlement Assistance as a Spanish Republican refugee. The Republic of France had certified to the International Rescue Committee that the alien was a Spanish refugee who had been residing in France for many years. I am setting forth in Appendix I of this Opinion those portions of the uncontradicted testimony before the hearing officer which convince me that the ultimate finding in this case could not have been based upon the facts elicited at the hearing. Surely the hearing was not afforded as an empty gesture. It was held, we must assume, for the purpose of eliciting all relevant evidence for ultimate, mature consideration.

The testimonial summary of the investigator who heard the matter, was before the Commissioner when his Order of July 10 was made and states:

"The alien offers no evidence of a nature that he would be persecuted if returned to Spain."

In another portion of his summary, he says:

"There is no concrete evidence to substantiate his claim that he would be persecuted if returned to Spain."

These statements are made in the face of uncontradicted testimony by the alien that he has been a member of the Basque National Party in Spain and the Young Basque Group; that the Basque people want to gain their independence from Franco and have been against the regime

at all times; that while living in France, the French Government certified that he was a Spanish refugee in exile and that he was registered with the International Refugee Organization and received a document certifying that he was a refugee from Spain. While in France, he attended Loyalist meetings, the Loyalists being an anti-Franco organization. He also attended meetings of the Basque National Party which is purportedly a democratic anti-Franco organization. He was engaged in spreading underground propaganda and literature against the Franco regime. If found deportable he wants to go to any country except Spain. He stated further that he has never been interested in Communism and has never belonged to any Communist Party or any of its affiliates nor have any of his relatives, although they are all anti-Franco. Between 1946 and 1948 he was distributing anti-Franco literature in Spain. This is significant in the light of the fact that the Government makes much of his membership in the Young Franco movement between 1946 and 1948, which the alien testified he was compelled to join in Spain in order to obtain the right to employment. The record would seem to indicate that while he was in this organization he was still active in distributing anti-Franco literature and in fact was imprisoned for 2 months in 1947 for this activity. He was in a "concentration camp" (actually, a collection camp apparently like Ellis Island) in Genoa where he participated in a hunger strike for 8 days because the Italian officials refused to release him unless he would agree to return to Spain, which he refused to do. This incident is known to the Spanish government. His father is also a member of these organizations opposed to the Franco regime, and one of his uncles was a captain who fought against Franco in the Basque regiment in the Spanish Civil War. In France, he declared himself against Franco openly. He was sent out of Spain to France at the age of 10 with thousands of Spanish Basque children, because the Spanish Nationalist Government sought to prevent their falling into the hands of the Franco Government. He returned to Spain at the age of 19 in order to carry out propaganda for the Basque party, and it was during this period that he was imprisoned. He also testified that his father, who was a follower of the Basque party, was persecuted by the Franco regime and imprisoned for a period of 5 years.

In the face of this rather brief summary of the testimony, it is inconceivable that the investigator, summarizing the evidence for the Commissioner, would state that the alien offered "no evidence of a nature that he would be persecuted if returned to Spain." Instead, the investigator seems to have based his recommendations upon the following: . "The only indication that the alien was ever considered to be a political enemy of the Franco regime was when he was incarcerated for two months in 1947 in that he was suspected of being a Loyalist. Apparently, the alien has overcome this condition, in that he became a member of the Franco Youth Group when it served his convenience, from 1946 to 1948." The alien gave a most reasonable explanation of his membership in the Franco Youth Group. In short, it amounted to this: He had to have food and sustenance and in order to have that he had to work. In order to work he had to have a work card which he could only obtain as a member of the Franco Youth Group. The "convenience" the investigator suggests might more accurately have been called "hunger". It is interesting to note that the hearing officer completely lost sight of the fact that the alien was arrested and imprisoned for being suspected of being a political enemy of the regime in power in 1947 (after he had joined the Youth Movement). The hearing officer also stated in his summary to the Commissioner:

"As late as January, 1952, the alien sought the aid of his Government and received a passport from the Spanish Consulate at San Francisco, California so that he would be in a position to secure employment as a seaman. The alien seems to have little difficulty in falling into the good graces of his Government when it suits his convenience."

The hearing officer concludes that receiving a passport from the Spanish Gov-

ernment is synonymous with and final evidence of being in the good graces of the Spanish Government. The passport was applied for as the alien explained in order that he might follow his employment as a seaman, and he was unemployable without some official recognition of his nationality.

It is upon testimony such as this and the summary of the hearing officer that the Commissioner made his Order of July 10, 1952, stating that he did not find that the alien if deported to Spain, would be subjected to physical persecution.

█ It should be noted that danger lurks in the practice of submitting a "summary" to the Commissioner. It permits of the temptation not to read the entire record of the testimony submitted and to rely instead on the 2¼ pages of summary instead of the 14 pages of testimony. One wonders also how 2¼ pages can adequately summarize 14 pages of testimony without omitting important portions. Summarization leads to omissions which in this case were vital ones. Suffice it to say, the hearing officer's statement that the

"alien offers no evidence of a nature that he would be persecuted if returned to Spain"

and his recommendation to the Attorney General that he make a finding that the alien was not subjected to physical persecution if deported to Spain, is so contrary to a fair evaluation of the testimony at the hearing, which I have read with extreme care, as to indicate an arbitrary and capricious appraisal of the testimony by the hearing officer himself and ultimately by the Commissioner in behalf of the Attorney General.

In the case at bar, the evidence supporting the alien's claim is not only his own testimony but, in addition, uncontradicted documentary evidence of the United States Office, Provisional Intergovernmental Committee for the Movement of Migrants from Europe, certifying that he had been determined by the International Refugee Organization to be a Spanish Republican refugee, as well as the certificate of the French Government (the alien had resided in France as a refugee for many years) issued at the request of the International Rescue Committee, certifying that the alien was a Spanish refugee. The probative value of this evidence is strong and convincing. The evaluation placed upon it by the hearing officer and ultimately by the Commissioner, in behalf of the Attorney General, to whom the officer reported, was so contrary to the proven facts and to a fair evaluation of the evidence as to amount to a deprivation of due process of law.

The so-called finding of the Commissioner which ultimately determined the question was contained in an "Order" and it does not indicate what, if anything, was considered by him in making his ultimate finding. Findings call for a basis or reason for conclusions reached, which do not exist here. Indeed, the form of his statement would suggest that not even a genuine finding was made.

Judge Dimock of this Court pointed out in United States of America ex rel. Chen Ping Zee v. Shaughnessy, D.C., 107 F.Supp. 607.

"In the present state of affairs in the world, it does not seem to me that a person's testimony that he would be subject to persecution in a Communist country can be dismissed so lightly and there is no indication or reason stated in the files or return that would tend to show that these relators would not be subject to persecution."

The same cautious attitude applies with equal force to this case.

The writ is sustained upon appropriate conditions to be incorporated in the order which is directed to be settled hereon.

APPENDIX I.
Examining Officer To Alien:
"Q. What organizations do you belong to at the present time? A. I belong to the Basque National Party in Spain.
"Q. Is that the Partida Nationista Basque? A. Yes.
"Q. How long have you been a member of the P. N. B? A. Since I was a young boy until 1947.

*    *    *    *    *    *

"Q. Did you also belong to the Young Basque Group? A. Yes.

"Q. How long were you connected with that group? A. Since my childhood.

\* \* \* \* \* \*

"Q. Were you a member of the Falangist movement? A. No.

"Q. Are you a member of the Young Franco Movement? A. I was forced to join the Youth Organization—the Franco Youth movement. I was forced to be inducted in order to get permission to work.

"Q. When did you become a member of that organization? A. Between 1946 and 1948, before I left Spain.

"Q. When you say you were forced to join, you mean you were forced to join under duress? A. Yes, I was obliged to join; then I was issued a permit to work.

"Q. When you say you were 'obliged', you mean it was convenient to do so or you were forced to join? A. I was compelled to join in order to receive the permit to work.

"Q. Were any threats made against you if you did not join the organization? A. No.

\* \* \* \* \* \*

"Q. Did you belong to any organization other than the P. N. B., the Young Basque group and the Young Franco movement? A. I belonged to the Sports Organization which was a branch of the National Basque. In France, I joined the Loyalist refugees in order to obtain the refugee card to remain temporarily in France.

"Q. For what period of time did you belong to that organization? A. For a short period in 1949.

"Q. Was that organization tied up in any way with the Falangist Party? A. Anti-Falangist.

\* \* \* \* \* \*

"Q. How often did you attend the meetings of the P. N. B.? A. About five or six meetings.

"Q. How often did you attend the meetings of the branch of the national organization, the Youth Sports Group? A. Many times.

"Q. How often did you attend the meetings of the Young Franco organization? A. Never.

\* \* \* \* \* \*

"Q. What is the nature of the P. N. B.? A. It is a democratic, anti-Franco organization.

"Q. What about the Loyalist organization in France—what was the nature of that organization? A. They were against Franco and they aided refugees. This organization originated in Basque Province and besides, many foreigners belonged to that organization.

"Q. What was the nature of that organization? A. Anti-Franco; they fought against Franco's Forces.

\* \* \* \* \* \*

"Q. Did you hold any office in any of those organizations? A. No.

"Q. Have you ever done any work for those organizations? A. Yes.

"Q. What was the nature of the work you performed and for what organization? A. Spreading underground propaganda literature.

"Q. If you were found to be deportable, what country do you prefer to be deported to? A. Any country except Spain.

"Q. Have you any assurance that you would be acceptable to any country other than Spain? A. Yes.

"Q. What country? A. A South American country.

\* \* \* \* \* \*

"Q. Do you desire to return to Spain? A. No.

"Q. Do you desire to reside in the United States? A. Yes.

"Q. State your reasons why you prefer to reside in the United States rather than to return to Spain. A. Because in Spain the country is Fascist and it is a Dictatorship. The United States is a democratic country.

"Q. Do you understand the principles of Communism? A. I was never interested.

"Q. Did you ever belong to the Communist Party or any of its affiliates in this country or in any other country? A. No.

\* \* \* \* \* \*

"Q. State what you know about Fascism? A. It is a dictatorship—lack of liberty and freedom of speech.

\* \* \* \* \* \*

"Q. What, if anything, have you done to show your support of or opposition to Fascism? A. I was always against Fascism.

"Q. What did you do to show you were opposed to Fascism? A. I was distributing literature.

"Q. What kind of literature? A. Against Franco.

"Q. When did that take place? A. From 1946 to 1948 in Spain.

"Q. How often did you have occasion to distribute literature that was against the Franco Government? A. I was distributing that literature many times.

"Q. During what years? A. Between 1946 and 1948.

"Q. Have you spoken for or against Fascism at any time? A. Against.

"Q. Where, when and under what circumstances? A. I didn't speak openly; I only did it underground.

\*   \*   \*   \*   \*   \*

"Q. Just what is the aim of the P. N. B. in Spain? A. An organization to separate the Basque Province from Spain—it was political.

"Q. Did that party support or oppose Fascism? A. Against Fascism.

"Q. What was the extent of your activities in that Party? A. I was spreading propaganda literature against Franco and I was raising the National Basque flag.

"Q. When you were in a concentration camp in Genoa for eight months you participated in a hunger-strike for eight days and you were released on parole. What was the nature and extent of that activity? A. We declared an eight-day hunger strike.

"Q. Who declared? A. Fifteen Spaniards.

"Q. What was the reason for the hunger-strike? A. Because we couldn't leave the camp unless we agreed to return to Spain.

\*   \*   \*   \*   \*   \*

"Q. Why were you in that camp in Italy? A. Because I escaped from the ship which was taking me to Spain.

"Q. Were any of your close relatives members of a political party? A. My father belongs to the organizations mentioned before, but only secretly.

"Q. The P. N. B.? A. Yes.

\*   \*   \*   \*   \*   \*

"Q. Did any of your relatives ever hold any office in Spain? A. One of my uncles was a Captain of a Basque regiment during the Civil War.

"Q. Have any of your relatives supported Fascism in any way, to your knowledge? A. No.

"Q. Have any of your relatives supported Communism in any way? A. No.

"Q. Have any of your relatives been active in opposing Fascism? A. All my relatives are against Franco.

"Q. How do you know this? A. When I was in Spain, I knew that and by corresponding with them.

\*   \*   \*   \*   \*   \*

"Q. Have you ever engaged in any political activity of any kind in any country, and, if so, under what circumstances? A. I declared myself against Franco in France.

"Q. Has your conduct or activities, to your knowledge, come to or brought to the attention of the Fascist Party of the Government of Spain? A. Yes.

"Q. In what way has the Fascist Party of Spain or the Spanish Government knowledge of your activities or conduct against them? A. In 1948 in Spain, the Falangist Party suspected that I belonged to the Basque National organization.

\*   \*   \*   \*   \*   \*

"Q. Have you ever been arrested, detained, incarcerated, apprehended or questioned by officials of either the Fascist Party of Government of Spain? A. In 1947, I was in jail for two months.

"Q. Why? A. I was caught near the border—they suspected I was waiting for underground literature from France.

"Q. In view of your statements, do you believe you would be subject to political persecution if you returned to Spain? A. Yes.

"Q. Why would you be persecuted? A. I belonged to the P. N. B. and because I was in jail for suspicion of being a Loyalist."

\* \* \* \* \* \*

Counsel To Alien:

\* \* \* \* \* \*

"Q. How did you get to France? A. I was sent to France with other children who were refugees.

\* \* \* \* \* \*

"Q. Did many children then leave Spain? [in 1937] A. Many thousands.

"Q. Do you mean the Spanish Nationalist Government sent out the children of the followers of that Government in 1937 to avoid their falling into the hands of Franco? A. Yes.

\* \* \* \* \* \*

"Q. So when you returned to Spain in 1946, how old were you? A. About nineteen.

"Q. Did I understand you to say you went to Spain in order to carry out propaganda for the Basque Party? A. Yes.

"Q. Your father, he was a follower of the P. N. B. Was he persecuted by the Franco regime? A. Yes.

"Q. What happened to him? A. He was a prisoner for five years.

\* \* \* \* \* \*

"Q. In 1936 when the Spanish Civil War started, were the Basque for or against Franco? A. Against Franco.

"Q. Is that still the feeling of the Basque people? A. Yes.

"Q. What religion predominates in the Basque Province? A. Catholic.

"Q. What is the grievance of the Basque people against the Franco regime? A. The Basque people want to gain their independence.

\* \* \* \* \* \*

"Q. Did the Italian Government ask the Spanish Consulate in Italy to report those Spaniards? A. The Spanish Consulate was in contact with the Italian Government.

"Q. Did the Spanish Consulate know of the fifteen Spaniards who didn't want to go back to Spain? A. Yes.

"Q. Did you ever have any documents certifying that you were a Spanish political refugee? A. Yes.

"Q. What documents? A. A Spanish Refugee Certificate.

"Q. Where was it issued? A. In Paris, France.

"Q. By whom? A. By the Loyalist Government.

"Q. By the Loyalist Government in exile? A. Yes.

\* \* \* \* \* \*

"Q. If you say you are a refugee from Spain, how come you have a Spanish passport? A. Because as a Spanish national, I needed that document for my work as a seaman.

\* \* \* \* \* \*

"Q. Were you ever registered with the International Refugee Organization? A. Yes.

"Q. Have you ever received a document from the I. R. O. certifying that you are a refugee from Spain? A. Yes.

\* \* \* \* \* \*

"Q. You say that the fact that you are recognized by the Central Office for Spanish refugees and the I. R. O. as a political refugee from Spain would in itself bring about persecution by the Spanish authorities if they could get you? A. Yes."

Examining Officer To Alien:

"Q. Can you explain under what circumstances Spanish Passport #196362 was issued to you? A. It was necessary for me to establish my Spanish nationality to secure work on the ships.

"Q. Did you apply for this passport in San Francisco, California? A. Yes.

"Q. Did you make application to the Spanish Consulate at San Francisco, California, for a passport? A. I made one application in January 1952.

"Q. Did you receive a passport? A. Yes.

"Q. Where is the passport now? A. I don't know.

"Q. What was the reason for your asking the Spanish Government for a passport? A. To work on the ships as a seaman.

"Q. You did have a passport that you applied for in January 1952 in order that you could ship as a Spanish national, is that so? A. Yes, but it was a different one from the one in the file.

"Q. You found it necessary to make application in January 1952 because you were having trouble in following your job as a seaman without one? A. Yes.

"Q. Did you have any trouble securing one from the Spanish Consulate at San Francisco, California? A. No."