**UNITED STATES ex rel. DOLENZ v. SHAUGHNESSY.**

No. 119, Docket 22530.

United States Court of Appeals Second Circuit.

Argued Nov. 13, 1952.

Decided Dec. 5, 1952.

Myles J. Lane, U. S. Atty., Southern Dist. of New York, New York City, for respondent-appellee, William J. Sexton, Asst. U. S. Atty., New York City, Louis Steinberg, Dist. Counsel, Immigration & Naturalization Service, New York City, Max Blau, Attorney, Immigration & Naturalization Service, New York City, of counsel.

Feingold & Falussy, New York City, for relator-appellant, Alfred Feingold, Aloysius C. Falussy, and Robert Bloom, New York City, of counsel.

Before AUGUSTUS N. HAND, CHASE, and CLARK, Circuit Judges.

CHASE, Circuit Judge.

The primary question presented by this appeal is whether a failure by the Commissioner of Immigration and Naturalization, acting as the duly designated delegate of the Attorney General, to find that a deportable alien would be physically persecuted in the country to which he has been deported is a compliance with the applicable law. The subordinate questions are (1) whether the appellant was given a hearing consonant with the requirements of due process; and (2) whether, on the proof presented, the delegate of the Attorney General was required to make findings of fact, and, if so, whether the failure to find that the appellant would be physically persecuted if deported as ordered was so arbitrary and capricious that it cannot stand.

The appellant is a citizen of Yugoslavia who came to this country in October 1949 as a seaman on the S. S. Huradsk and was admitted for shore leave. He then deserted the ship and has remained in this country ever since. He was arrested in February 1951 on an immigration warrant charging his unlawful entry as an immigrant not in possession of a valid immigration visa. During the hearing on this charge, it was shown that he had been a member of the Communist Party of Yugoslavia before his entry into the United States and remained a member of the Party after entry. He was ordered deported on each of the above mentioned grounds. On appeal to the Commissioner the order was modified to limit deportability insofar as it was based on membership in the Communist Party to his membership therein after entry. The Board of Immigration Appeals upheld this order and, the alien having declined to designate any country to which he desired to be deported, a warrant of deportation was issued directing his deportation to Yugoslavia if that country would receive him, otherwise to Italy.

Before the instant writ was obtained, the appellant sought to avoid deportation by means of three writs of habeas corpus, the first of which was dismissed and the others withdrawn. The last was withdrawn when he was granted an administrative stay of deportation to enable him to show that, if deported to Yugoslavia, he would be subjected to physical persecution.

The statute on which he now relies, 8 U.S.C. § 156, enumerates the countries to which deportable aliens may be sent, but also provides that "no alien shall be deported under any provisions of this chapter to any country in which the Attorney General shall find that such alien would be subjected to physical persecution."

The appellant is twenty-five years of age and was born in Fiume which was then a part of Italy, but now of Yugoslavia. He was active in the Communist Youth Movement in Yugoslavia before he became a seaman. Although one of the grounds on which he was ordered deported was his membership in the Communist Party after his entry to this country, he contends that if he is returned to Yugoslavia he will be subjected to physical persecution as a renegade from the Communist Party there.

From appellant's testimony it appears that he had been a lieutenant in the Yugoslavian army and for about two months, while still in the army, a member of the Ozna, the Yugoslav Secret Police. He

was a member of the Communist Party in Yugoslavia although he testified that he did not want to be and was once suspended from such membership for forty-three days for a reason not disclosed. In June 1948 he had been beaten by communists while with others he was singing songs which were mistakenly thought to be against the Tito government; and he was again beaten when, unknown to his assailants, he was working with the Secret Police. His father still lived in Yugoslavia but his mother and a brother had escaped from that country and were in a camp for displaced persons in Italy. None of them had been persecuted in Yugoslavia. After leaving the army he attended the merchant marine school called Pomeriski Institute in Fiume where he was the secretary of the Skoj, a communist student organization, until March 1948. He then devoted his time to preparation for his final examinations which he took about three months later and qualified for service as a merchant seaman in which service he remained until he deserted his ship as above noted.

He further testified to show that he would be physically persecuted if deported to Yugoslavia, that he had severed his connection with the Communist Party both when he deserted his ship and also in November 1949 when in New York though he did not disclose what, if anything, he had done in New York to accomplish that. He had seen a Yugoslavian Army officer shot by a firing squad in 1944 and, though he didn't know the reason, "they were talking around that it was because he wanted to desert and was heard to say something against the Communist Party." A man in Fiume whose name he didn't know had "ideas" which were "contrary to the Communist Party" and one day "he got three shots in the back and the Yugoslav Secret Police came to take the details and looked for the fellow who killed him." He also testified that in 1947 he went to the cemetery with his sister and "I went inside in the mortuary chamber and I saw a man. I didn't know him, he was all chapped, every inch of his skin, face, legs and I asked 'who is this fellow,' and the guard answered 'we found him on the street, he had an accident.'

If he dropped down from an airplane he would not have come down in this state he was in."

His testimony to show that he would be subjected to physical persecution if deported as ordered was supplemented by two witnesses, one a former Chief of the Foreign Press Department in the Tito government in Yugoslavia and the other a former citizen of Yugoslavia who had never been a member of the Communist Party though he had been a private in the army for about three months. Both had been in this country several years and both testified that in their opinion the appellant would be physically persecuted if deported as ordered.

No countervailing evidence was presented and the hearing officer filed his report showing he did not believe that the appellant would be subjected to physical persecution if deported to Yugoslavia. This report, together with the copy of the testimony, was reviewed by the Commissioner of Immigration and Naturalization who, as the delegate of the Attorney General, closed the matter on May 21, 1952. In the order, the Commissioner said that, "after a review of the facts in this case, I do not find that if this alien is deported to Yugoslavia he would be subjected to physical persecution."

■ Deportation proceedings must conform to procedural due process though compliance with sections 1004, 1006, and 1007 of the Administrative Procedure Act, 5 U.S.C.A. § 1001 et seq., held necessary in Wong Yang Sung v. McGrath, 339 U.S. 33, 70 S.Ct. 445, 94 L.Ed. 616, is no longer required. 8 U.S.C. § 155a. Appellant does not complain of any lack of due process up to the time when it was decided that he was a deportable alien but insists that there was a departure therefrom in directing that he should be deported to Yugoslavia. The officer who held the hearing in which he was given an opportunity to introduce evidence to show that he would be physically persecuted in Yugoslavia was an investigator in the Immigration Service. The appellant insists that he "was entitled to a hearing before an impartial trier of the facts, who would then make findings and conclusions of law, which if unfavorable would open the way to administrative appeals to the

Board of Immigration Appeals and eventually to the Attorney General as usually provided by regulations in deportation matters and as the immediate law involved provides."

■ We think the appellant has misconceived the function of the Attorney General in respect to this phase of the deportation proceedings. He is not a reviewing officer who supervises an order made by an administrative agency which has directed the country or place to which a deportable alien shall be sent. He is charged by statute with the duty, and given the primary authority, to make the direction himself. He may perform his duty through his delegate and the delegate may use such procedure, reasonably designed to ascertain the pertinent facts, as his judgment dictates, subject of course to the approval of the Attorney General. The fact that the one chosen to hear the evidence was an investigator in the Immigration Service, he not being shown to have been disqualified by personal bias or prejudice, is without significance. Congress did not see fit to prescribe any procedure to be followed by the Attorney General in performing this duty of designation nor make provision for any particular type of review of his action. Judicial review is, consequently, limited to whether the procedure was essentially fair. Carlson v. Landon, 342 U.S. 524, 72 S.Ct. 525; see Harisiades v. Shaughnessy, 342 U.S. 580, 72 S.Ct. 512.

■ We think this was of that character. The appellant was given the opportunity to present his evidence, and after considering that evidence the delegate of the Attorney General decided that no finding that the appellant would be physically persecuted should be made. The situation of this appellant is analogous to that of the alien in United States ex rel. Kaloudis v. Shaughnessy, 2 Cir., 180 F.2d 489. He has no right to remain in the United States and when the Attorney General has by his authorized delegate actually exercised his discretion after proceeding in a manner fairly calculated to give him an adequate basis for decision there has been no denial of procedural due process. See United States ex rel. Schlueter v. Watkins, 2 Cir., 158 F.2d 853.

No particular findings were required to support the decision not to make the finding which alone would have excluded Yugoslavia from the category of countries to which the Attorney General could in his discretion direct the deportation of the appellant. A decision which followed the language of the statute left nothing uncertain and was sufficient. See United States v. Curtiss-Wright Corp., 299 U.S. 304, 331, 57 S.Ct. 216, 81 L.Ed. 255. Nor were the opinions of the witnesses as to what would happen to the appellant if deported as ordered such evidence that the failure of the Attorney General to adopt them as his own made the hearing unfair. United States ex rel. Tisi v. Tod, 264 U.S. 131, 44 S.Ct. 260, 68 L.Ed. 590.

Affirmed.

CLARK, Circuit Judge (dissenting).

After the statutory provision here in issue was added to 8 U.S.C. § 156 by amendment in 1950, this court construed it to require that "before the appellant can be deported, the Attorney General * * * must find that he will not be subjected to physical persecution in the country to which he is to be sent." U. S. ex rel. Harisiades v. Shaughnessy, 2 Cir., 187 F.2d 137, 142, affirmed Harisiades v. Shaughnessy, 342 U.S. 580, 72 S.Ct. 512. In so stating, I believe the court was making a reasonable interpretation of the statutory mandate— an interpretation also reached by several district judges.[1] The requirement of a definite finding for certain action implies deliberation and quasi-judicial adjudication, rather than mere refusal to think or act; rationally it suggests that contrary action should be based on a contrary finding. This logical conclusion is here strengthened by the obvious Congressional intent to ameliorate the potentially tragic consequences which may attend deportation to certain countries. The construction claimed by the government makes a cruel hoax of the announced relief. The Attorney-General or his representatives may sit back and do nothing; they need not give even the consideration necessary to say, "We are not convinced"—and the statutory provision becomes nugatory. In argument to us, that

contention was actually made; it was said that this provision was in no way for the benefit of the deportee, but was only protection to the government officer in his performance of merely administrative and ministerial functions. But so restrictive a function seems quite inconsistent with the structure of the section (which also gives a choice to the alien if he can get a country to recognize it). And to say that such an interpretation is inhumane is an understatement. The opinion herewith does not explicitly adopt this rationale; but it unfortunately seems the natural deduction from my brothers' decision.

If I am correct, the finding here in question is inadequate, since it is carefully negative in form. In view of the precise language used with obvious circumspection, I do not believe it possible to read it as constituting the finding I deem necessary. Hence I would reverse without getting to the question of the amount of evidence needed or the extent of the Attorney-General's discretion in evaluating testimony. But I think some reference may be made to the showing on behalf of the alien as bearing upon the failure of the government officer to make a finding; for conceivably no finding may be necessary where no case is made for the alien. Here I am bound to say that I think a rather persuasive case is made not only by the alien's own testimony, but by that of two apparently intelligent expert witnesses—one formerly in the Tito government, now professor of Modern European History in New Jersey, the other Dean of the Serbian Cathedral of St. Sava in New York City. I suggest that reading this record—containing nothing to challenge the alien's

contention—hardly any of us would doubt the fate awaiting this renegade Communist if returned to the Communist country where he had joined the party as a boy.

I recognize that the area in which an alien can seek judicial relief and does not remain subject to the unreviewable and uncontrollable doom of a governmental official is being steadily narrowed by Congress, which has the responsibility, and that judges must obey the declarations of governmental policy made by the legislative body. But I think we ought not to rush ahead of Congressional intent. I am impressed by the wisdom of a distinguished American lawyer, who finds that courts (as well as other bodies governmental and lay) have not been thus hesitant—in this among other crucial areas—and who gives this measured conclusion:

"May it not well be that the greatest danger to our institutions lies not in the threats of foreigners but in our own weakness in yielding to emotion and our increasing readiness to minimize and disregard the fundamental rights of the individual? What is needed is a resurgence of the moral principles upon which our greatness was built. Thus the right to a fair hearing involves a moral principle recognized long before the adoption of the Constitution. It has become a legal right because it was first recognized as a moral right, and the age-old test remains unchanged—the test of 'what is fair between man and man.'" John Lord O'Brian, New Encroachments on Individual Freedom, 66 Harv.L.Rev. 1, 26, 1952.

I would reverse.

1. See Sang Ryup Park v. Barber, D.C.N. D.Cal, 107 F.Supp. 603; Id., D.C., 107 F.Supp. 605; United States ex rel. Chen Ping Zee v. Shaughnessy, D.C.S.D.N.Y., 107 F.Supp. 607; and United States ex rel. Watts v. Shaughnessy, D.C.S.D.N.Y., 107 F.Supp. 613.