**Veljko STANISIC, Appellant,**

v.

**UNITED STATES IMMIGRATION AND NATURALIZATION SERVICE etc.,**
**Appellees.**

**No. 21272.**

United States Court of Appeals
Ninth Circuit.

April 17, 1968.

540

G. Bernhard Fedde (argued), Don Eva, Bartlett F. Cole, Sr., Portland, Or., for appellant.

Norman Sepenuk (argued), Asst. U. S. Atty., Sidney Lezak, U. S. Atty., Portland, Or., Steve Suffin, Atty., INS, San Francisco, Cal., for appellees.

Before BROWNING, DUNIWAY, and ELY, Circuit Judges.

BROWNING, Circuit Judge:

Appellant Stanisic, a Yugoslavian national arrived in Coos Bay, Oregon, as a crewman aboard the M-V SUMADIJA, a Yugoslavian vessel. He was issued a shore leave permit by a United States immigration officer pursuant to 8 U.S.C. § 1282(a) (1) (1964) and 8 C.F.R. § 252.1(d) (1).

Three days later, after several visits ashore, appellant presented himself at the office of the District Director of the Immigration and Naturalization Service at Portland, Oregon, to request asylum. His landing permit was immediately revoked under the authority of subsection (b) of section 1282, which provides that *"any immigration officer may, in his discretion, if he determines that an alien \* \* \* does not intend to depart on the vessel or aircraft which brought him, revoke the conditional permit to land which was granted such crewman under the provisions of subsection (a) (1) of this section, take such crewman into custody, and require the master or commanding officer of the vessel or aircraft on which the crewman arrived to receive and detain him on board such vessel or aircraft, if practicable, and such crewman shall be deported from the United States at the expense of the transportation line which brought him to the United States. \* \* \* Nothing in this section shall be construed to require the procedure pre-*

scribed in section 1252 of this title to cases falling within the provisions of this subsection."

On the following day appellant was offered an opportunity to make a showing before the District Director in support of his claim for asylum under 8 C.F.R. § 253.1(e), which provides that an alien crewman whose "conditional landing permit issued under § 252(d) (1) of this chapter is revoked who alleges that he cannot return to a Communist * .* * country because of fear of persecution in that country on account of race, religion, or political opinion may be paroled into the United States under the provisions of section 252(d) (5) of the Act [8 U.S.C. § 1182(d) (5)] * * *."

Appellant's counsel refused the offer, contending that appellant was entitled to have his claim considered, not as an application for parole under the regulation, but rather as a petition for stay of deportation under 8 U.S.C. § 1253(h) (1964), which (as it then read) authorized the Attorney General to withhold deportation "of any alien within the United States to any country in which in his opinion the alien would be subject to physical persecution * * *." Appellant's counsel contended that the claim should be heard in accordance with the procedures established by 8 U.S.C. § 1252(b) (1964), which included a hearing before a Special Inquiry Officer with a full array of procedural protections, followed by administrative review.

The District Director denied appellant's claim for asylum for want of a supporting showing, and ordered that appellant be returned to his ship. Appellant's counsel filed suit in the court below seeking review of the District Director's order and injunctive relief.

The district court held that appellant was not entitled to a section 1252(b) hearing because of the express provision of section 1282(b), quoted above, that "Nothing in this section shall be construed to require the procedure prescribed in section 1252 of this title to cases falling within the provisions of this subsection." However, the court stayed the District Director's order and referred the matter back to the District Director with instructions to hold a hearing under 8 C.F.R. § 253.1(e).

Appellant offered evidence in support of his claim before a delegatee of the District Director. On the basis of the record made, the District Director concluded that the facts "do not establish that applicant has shown that he would be physically persecuted if he were to return to Yugoslavia," and denied relief. The district court, which had retained jurisdiction, sustained the administrative action, and dissolved the stay order. Stanisic v. Immigration & Naturalization Service, 243 F.Supp. 113 (D.Ore.1965).

Appellant did not appeal, but instead unsuccessfully petitioned Congress for a private bill. When the District Director thereafter ordered appellant to appear for removal, appellant submitted a renewed application for stay of deportation under section 1253(h), pointing out that subsequent to the hearing by the District Director on appellant's prior application, the statute had been amended to remove the limitation of relief to cases involving "physical" persecution. Appellant requested a full section 1252(b) hearing under the revised standard. He also sought permission to depart voluntarily at his own expense if his petition were rejected.

The District Director denied the new application without a hearing. He stated that the first hearing had been held under the regulation, rather than the statute, and that the regulation had always read as the statute was later amended to read. He reiterated his position that appellant was not entitled to section 1252(b) procedures, and relied upon the earlier district court decision approving this view. He rejected appellant's request for voluntary departure on the ground that under section 1282(b) appellant "is to be placed in the custody of the steamship company which brought him to the United States and his deportation from the United States is to be effected by the steamship company." The District Director therefore denied

appellant's petition in its entirety and ordered appellant to appear for removal three days later.

Appellant filed a complaint in the district court, challenging the District Director's decision and praying for a restraining order on various grounds which, so far as necessary to our decision, are stated below. Appellees answered. The district court entered judgment on the pleadings, denying appellant any relief. This appeal followed.

Both sides support the jurisdiction of the district court to enter the judgment appealed from.

Since the order of the District Director was not entered in a section 1252(b) proceeding, it is not within the purview of 8 U.S.C. § 1105a(a) (1964), which vests exclusive jurisdiction to review section 1252(b) orders in the Courts of Appeals. Yamada v. Immigration & Naturalization Service, 384 F.2d 214 (9th Cir. 1967).

 Since the order was not one made under the provisions of 8 U.S.C. § 1226 (1964), appellant's remedy in the district court was not limited to habeas corpus by 8 U.S.C. § 1105a(b) (1964). We see no reason why the order could not be reviewed by the district court under the Administrative Procedure Act, 5 U.S.C. § 1009 (1964)—as that court held in entertaining appellant's first complaint. 243 F.Supp. at 115–116. But even if habeas corpus were the exclusive

remedy, it would be available to appellant, for he was, and now is, subject to a parole order of the District Director. Jones v. Cunningham, 371 U.S. 236, 243, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963).

The district court therefore had jurisdiction to review the District Director's order.

Appellees urge us to hold that the question of whether appellant was entitled to the deportation procedures of section 1252(b) was decided against him by the district court in appellant's first action, and since the judgment in that action has become final the issue is not open to re-examination.

Appellant points out that the ship upon which he arrived and on which he was to depart was still in port when the District Director entered the order reviewed in the first action, but that it had departed long before the District Director entered the order attacked in the second action.[1] He contends that this factual difference raises a wholly different legal issue, rendering the second order erroneous, even assuming the correctness of the first.[2]

 We agree. We conclude that subsection (b) of section 1282 authorized appellant's summary deportation aboard the vessel on which he arrived or, within a very limited time after that vessel's departure, aboard another vessel pursuant to arrangements made before appel-

---

1. The record does not disclose the vessel's exact sailing date. However, the District Director's second order was entered more than 18 months after the entry of his first order.

2. The issue which appellant raises here, and the only issue with which we deal, is one of statutory construction. We are not concerned with the constitutionality of the summary deportation proceedings authorized by § 1282(b).

It is suggested in Kordic v. Esperdy, 386 F.2d 232, 236–237 (2d Cir. 1967), quoting from Stellas v. Esperdy, 366 F.2d 266, 269 (2d Cir. 1966), vacated 388 U.S. 462, 87 S.Ct. 212, 18 L.Ed.2d 1322 (1967), that "any Constitutional right to full-scale deportation proceedings" is "waived" by

acceptance of a landing permit in view of the following provision imprinted on the permit form:

By accepting this conditional permit to land the holder agrees to all the conditions incident to the issuance thereof, and to deportation from the United States in accordance with the provisions of section 252(b) [8 U.S.C. § 1282(b)] of the Immigration and Nationality Act.

The question before us is the meaning of the phrase "deportation from the United States in accordance with the provisions of section 252(b) of the Immigration and Nationality Act." Obviously appellant has not agreed to any procedures which § 252 (b) does not authorize.

lant's vessel departed.[3] We further conclude that since section 1282(b) did not authorize summary deportation of appellant in the circumstances existing when the District Director entered the order under review, appellant could be deported only in accordance with sections 1251 and 1252 of the Act.

We turn first to the premise that the general provisions regarding deportation found in sections 1251 and 1252 of the Act apply to alien crewmen who have been permitted to land for shore leave, except as section 1282(b) precludes their application.

Section 1251(a) states that "any alien in the United States (including an alien crewman)" shall be deported if he falls within one of the categories described in that section. Section 1252(b) outlines the procedures "to determine the deportability of any alien." Thus the language of sections 1251 and 1252 is broad enough to include alien crewmen who have landed under section 1282(a) permits if such crewmen are "in the United States," as that phrase is used in section 1251, and are not merely "on the threshold of initial entry," as are persons paroled into the United States under section 1182(d) (5). Shaughnessy v. U. S. ex rel. Mezei, 345 U.S. 206, 212, 73 S.Ct. 625, 97 L.Ed. 956 (1953). See also Leng May Ma v. Barber, 357 U.S. 185, 78 S.Ct. 1072, 2 L.Ed.2d 1246 (1958); United States ex rel. Lam Hai Cheung v. Esperdy, 345 F.2d 989, 990 (2d Cir. 1965).

Congress apparently thought alien crewmen landing under section 1282(a) permits would be within the reach of the general deportation sections; otherwise the provision in section 1282(b) expressly excluding section 1252 coverage would have been wholly unnecessary.

The same conclusion as to the congressional understanding is suggested by other elements in the structure of section 1282.

To obtain a landing permit under section 1282(a) an alien crewman "must establish to the satisfaction of the immigrant inspector that he is eligible to enter the United States * * *." Besterman, Commentary on the Immigration and Nationality Act, 8 U.S.C.A. 1, 39 (1953). He "must have in his possession a valid passport and a visa issued by an American consul" and "must be eligible to enter the United States under the general eligibility rules." Ibid.; 8 C.F.R. § 252.1 (c).[4]

Section 1282(a) contemplates issuance of landing permits both to crewmen who intend to depart on the vessel on which they arrived and to crewmen who intend to depart on a different vessel.[5] However, the summary procedures of section 1282(b) apply only to those crewmen who were to depart on the vessel on which they arrived. Crewmen who were to depart on a different vessel are to be deported in accordance with sections 1251 and 1252 (Kordic v. Esperdy, 386 F.2d 232, 237 n. 5 (2d Cir. 1967)); and thus, admittedly, are treated as "in the United States." There is nothing in the language of section 1282 suggesting that some crewmen who land under section 1282(a) conditional landing permits are "in the United States" but that others are not.

Historically, seamen on shore leave have been treated as having "entered"

---

3. We therefore do not agree with the holding of the Court of Appeals for the Second Circuit in Kordic v. Esperdy, 386 F.2d 232, 237-238 (1967), that if an alien crewman's permit is revoked before the vessel on which he arrived and on which he was to leave departs he is deportable under § 1282(b) at any time thereafter, apparently without regard to the departure of his vessel or how long a period may have elapsed.

4. Stowaways are among the classes of aliens "excluded from admission into the United States," but alien crewmen are not. 8 U.S.C. § 1182(a) (18) (1964).

5. Landing permits issued to the former are referred to as "D-1" permits and to the latter as "D-2" permits, from the designation of the applicable subparagraphs of the regulations. See 8 C.F.R. § 252.1(d) (1) and (d) (2).

this country for purposes of the immigration laws (see, e. g., Claussen v. U. S. ex rel. Day, 279 U.S. 398, 401, 49 S.Ct. 354, 73 L.Ed. 758 (1929); U. S. ex rel. Stapf v. Corsi, 287 U.S. 129, 53 S.Ct. 40, 77 L.Ed. 215 (1932)), and as being subject to deportation in accordance with the general provisions of those laws as persons unlawfully in the United States. Colovis, U. S. ex rel. U. S. Lines, on Behalf of v. Watkins, 170 F.2d 998, 1000 n. 1 (2d Cir. 1948); Senate Report 1515, 81st Cong., 2d Sess. 547 (1950). The authorization of conditional landing permits by section 1282(a) did not change the status of crewmen on shore leave. Since the conditional landing permit was an administrative invention found in pre-1952 regulations, it was necessarily considered to be consistent with the pre-1952 law. House Report 1365, 82d Cong., 2d Sess. (1952), 2 U.S.Cong. & Admin. News p. 1722. The innovation in the 1952 Act was not the conditional landing permit, but the provision for summary revocation and deportation. 1 Gordon & Rosenfield, Immigration Law and Procedure § 6.3a (1967).

Finally, the premise that alien crewmen landed under section 1282(a) permits are deportable on grounds stated in section 1251 in accordance with section 1252 procedures, except only as section 1282(b) provides to the contrary, is supported by holdings, commentary, and practice applying sections 1251 and 1252 to such seamen whenever their cases, for one reason or another, do not fit into the very narrow limits within which summary proceedings are authorized by section 1282(b).[6]

We turn, then, to the question of the reach of the section 1282(b) exception to the general provisions of sections 1251 and 1252.

The section 1282(b) exception is very narrowly drawn. It does not apply to the deportation of crewmen who have "jumped ship" and entered the United States illegally, with no permit at all. As noted above, it does not apply to crewmen issued landing permits authorizing them to depart on vessels other than those on which they arrived. It does not apply to crewmen who have overstayed the twenty-nine day leave period without revocation of their landing permits. It does not apply to crewmen who were to leave on the vessel on which they arrived if their vessels have departed before their landing permits are revoked. In all of these situations crewmen may be deported only in accordance with section 1252(b) procedures.[7]

The purpose and language of section 1282(b) and the content of closely related sections of the Act, particularly when considered in light of the deliberate narrowness of the section 1282(b) exception, strongly suggest that summary deportation is authorized only if it can be accomplished by returning the crewman to his own vessel, with an exception for practical exigencies which goes no farther than to permit prompt deportation on another vessel arranged before the departure of the vessel on which the alien was a crewman.

Congress' purpose was to secure prompt removal of alien crewmen in order to close a "loophole" through which large numbers of alien crewmen had in

---

6. Matter of M, 5 I.N. 127 (1953); see also Kordic v. Esperdy, 386 F.2d 232, 237 n. 5 (2d Cir. 1967); 1 Gordon & Rosenfield, Immigration Law & Procedure § 6.3a (1967). The practice referred to is reflected in a multitude of cases, e. g., Foti v. Immigration & Naturalization Service, 375 U.S. 217, 84 S.Ct. 306, 11 L.Ed.2d 281 (1963); Cheng Kai Fu v. Immigration & Naturalization Service, 386 F.2d 750 (2d Cir. 1967); Sovich v. Esperdy, 319 F.2d 21 (2d Cir. 1963);

Blagaic v. Flagg, 304 F.2d 623 (7th Cir. 1962); Milutin v. Bouchard, 299 F.2d 50 (3d Cir. 1962); vacated on other grounds 370 U.S. 292, 82 S.Ct. 1562, 8 L.Ed.2d 501 (1962); Dunat v. Hurney, 297 F.2d 744 (3d Cir. 1962); Couto v. Shaughnessy, 218 F.2d 758 (2d Cir. 1955); United States ex rel. Dolenz v. Shaughnessy, 200 F.2d 288 (2d Cir. 1952); Matter of P, 9 I.N. 368 (1961); Matter of A, 9 I.N. 356 (1961).

7. See note 6.

the past "become lost in the general populace of the country," establishing relationships and statuses which made subsequent deportation difficult.[8] The means adopted was that of summarily revoking alien crewmen's landing permits and returning the alien crewmen to the vessels which brought them. Summary revocation and removal of alien crewmen without hearing or appeal was thought to be necessary if the alien crewmen were to be returned to their vessels without unduly delaying international commerce.[9] No other possible justification for this "extraordinary procedure"[10] was suggested.

As we have seen, section 1282(b) distinguishes between alien crewmen who were to depart on the vessel on which they arrived and those who were to depart on a vessel other than that on which they arrived, and provides for summary deportation only of the former. The only conceivable explanation for this distinction is that the summary procedure was intended to be used to put the alien crewmen back on their ship and to require their ship to remove them, or, at least, to arrange for their prompt removal at the ship's expense.[11]

Subsection (b) of section 1282 makes this explicit by providing that when the crewman's landing permit has been summarily revoked, the immigration officer may "require the master or commanding officer of the vessel or aircraft on which the crewman arrived to receive and detain him on board such vessel or aircraft, if practicable,[12] and such crewman shall

---

8. Senate Report 1515, 80th Cong., 2d Sess., 550–51 (1950). Joint Hearings before the Subcommittees of the Committees of the Judiciary on S. 716, H.R. 2379, and H.R. 2816, 82d Cong., 1st Sess. 156–60 (1951).

9. Alfred U. Krebs, Counsel of the National Federation of American Shipping, Inc., testifying at Joint Hearings before the Subcommittees of the Committees on the Judiciary on S. 716, H.R. 2379, and H.R. 2816, 81st Cong., 1st Sess., objected to § 1282(b) on the ground that the transportation company would be charged with the expense of deporting an alien crewman on the basis of an immigration officer's summary determination that the crewmen did not intend to depart with his vessel. Mr. Krebs stated, "It seems to us that there should be some procedure set up for a hearing, or something in that connection." Id. at 156; and further, "we do find fault with the fact that it is in the mind of the immigration officer as to what the intentions of that crewman are, without any hearing or any procedure being set up, or any evidence being introduced, to show that this man does not intend to return. That is the thing that we object to about it." Ibid.

In the course of the subsequent colloquy between Mr. Krebs and Richard Arens, Staff Director of the Senate Subcommittee, the following appears:

Mr. ARENS. If they had a hearing, Mr. Krebs, the probabilities are that the ship would have departed before the hearings were over, would it not?

Mr. KREBS. That is possible.

Mr. ARENS. And it is also possible that the 29 days itself would have expired before the hearing is concluded.

Mr. KREBS. That is right. That is certainly possible.

Mr. ARENS. So the net result of requiring the hearing before revocation of the permit to have a seaman land would be that you would not accomplish anything from the standpoint of getting your seaman out of the country.

Id. at 157. See also, House Report 1365, 82d Cong., 2d Sess. (1952), 2 U.S. Cong. & Admin.News p. 1722.

10. 1 Gordon & Rosenfield, Immigration Law & Procedure § 6.3a at 6–23 (1967).

11. Thus the regulations limit issuance of permits to crewmen intending to depart on a vessel other than that on which they arrived to situations in which "the immigration officer has consented to the pay off or discharge of the crewman from the vessel on which he arrived" (8 C.F.R. § 252.1 (d) (2)) when, presumably, there is no longer any relationship between the crewman and the vessel on which he arrived which would justify imposing the duty or expense of his removal upon the vessel.

12. Later provisions of the statute indicate that the qualification "if practicable" refers to a condition affecting a particular crewman or vessel which renders immediate detention aboard unfeasible, such as illness of the crewman or movement of the vessel to another port of the United States, but not to the departure of the vessel for a foreign port.

be deported from the United States at the expense of the transportation line which brought him to the United States."

Section 1284 further implements the legislative scheme in which summary deportation is linked directly to presence of the crewman's vessel. Subsection (a) of section 1284 imposes a fine upon the owner, agent, consignee, charteree, master, or commanding officer of a vessel or aircraft who fails to deport an alien crewman if required to do so under section 1282, and provides that "No such vessel or aircraft shall be granted clearance pending the determination of the liability to the payment of such fine, or while the fine remains unpaid," unless a bond is posted for payment. Subsection (b) of section 1284 provides that "proof that an alien crewman did not appear upon the outgoing manifest of the vessel or aircraft [on which he arrived] * * * shall be prima facie evidence of a failure to * * * deport such alien crewman."

Subsection (c) of section 1284 is quoted in full in the margin.[13] Although the first sentence recognizes that removal of a crewman following summary revocation of his landing permit may be accomplished on a vessel other than the one upon which the crewman arrived, the only alternative authorized is deportation "on another vessel or aircraft of the same transportation line," if this be practicable. The Attorney General is not given general authority to deport the alien crewman by any available means. More significantly, the section contemplates that the alternative arrangement shall be made while the vessel upon which the crewman arrived is still in port—his ship is not to be cleared for departure until the expenses incident to the alternative arrangement have been paid or guaranteed.[14]

The implementing regulations contemplate that a permittee may arrange with the master of his vessel to rejoin his ship at another port in the United States at which it will call before departing for a foreign port. 8 C.F.R. § 252.1. The regulation governing summary deportation of those permittees therefore provides that such a crewman may be taken into custody and "transferred to the vessel upon which he arrived in the United States, if such vessel is in any port of the United States and has not been in a foreign port or place since the crewman was issued his condition [sic] landing permit." 8 C.F.R. § 252.2.

13. Subsection (c) of § 1284 provides:

If the Attorney General finds that deportation of an alien crewman under this section on the vessel or aircraft on which he arrived is impracticable or impossible, or would cause undue hardship to such alien crewman, he may cause the alien crewman to be deported from the port of arrival or any other port on another vessel or aircraft of the same transportation line, unless the Attorney General finds this to be impracticable. All expenses incurred in connection with such deportation, including expenses incurred in transferring an alien crewman from one place in the United States to another under such conditions and safeguards as the Attorney General shall impose, shall be paid by the owner or owners of the vessel or aircraft on which

the alien arrived in the United States. The vessel or aircraft on which the alien arrived shall not be granted clearance until such expenses have been paid or their payment guaranteed to the satisfaction of the Attorney General. An alien crewman who is transferred within the United States in accordance with this subsection shall not be regarded as having been landed in the United States.

The concluding sentence of § 1284(c) does not apply to an alien crewman admitted on a landing permit. Its presence is explained by the fact that, as stated in § 1284(a), this section applies not only to alien crewmen permitted to land for shore leave but also to those who are being detained prior to entry pending examination by an immigration officer, to alien crewmen who have been inspected but have not been granted a landing permit, to alien crewmen who have been paroled into the United States under 8 U.S.C. § 1182(a) (5) which "shall not be regarded as an admission of the alien," and to alien crewmen who are hospitalized on arrival as provided in § 1283 for treatment of one of the diseases listed in § 1285 "including an alien crewman ineligible for a conditional permit to land under section 1282(a)."

14. The implementing regulation permits deportation other than on the vessel on which the crewman arrived only upon the written request of the master of the crewman's vessel. 8 C.F.R. § 252.2.

The accepted construction of section 1282(b), as we have noted, is that its provisions may not be invoked if the attempt to deport a crewman is begun after his ship has sailed, for as the court said in Kordic v. Esperdy, 386 F.2d 232, 237 (2d Cir. 1967), "the justification for quick resolution of the problem departs with the vessel." See also U. S. ex rel. Martinez-Angosto v. Mason, 344 F.2d 673, 685 (2d Cir. 1965); Matter of M, 5 I.&N. 127 (1953).

This much being conceded, it is difficult to see why the result should be different when section 1282(b) proceedings are begun, but not completed, before the vessel departs. Whenever the statutory scheme for utilizing the availability of an alien crewman's vessel to effect his speedy deportation is frustrated, the justification for quick resolution of the crewman's status is gone. What reason remains for not then affording the crewman the benefits of section 1252?

Although the time and effort which have already been invested in the aborted administrative process would be lost, summary deportation is not authorized simply as a device for saving administrative time, and, in any event, the time and effort invested in summary proceedings is, by definition, minimal. The careful provisions of section 1252 and the narrow scope of the section 1282(b) exception reflect a legislative judgment that, in the absence of exigent circumstances and a potential for substantial benefits from summary action, decisions affecting deportation should be based upon deliberate and thorough consideration in view of the nature of the issue presented and the importance of the interests at stake.

The purpose of section 1282(b) is palliative, not punitive. Its object is to provide a specific remedy for a particular problem, not to deprive alien crewmen of rights available to others simply to punish them. If an alien crewman is denied the benefits of section 1252 though the exigency justifying summary deportation has passed, great loss is inflicted on the crewman without purpose. This is so even though he concedes his deportability, as do the overwhelming majority of persons involved in section 1252 proceedings.[15]

Although the benefits of suspension of deportation by 8 U.S.C. § 1254(f) (1964) and adjustment of status by 8 U.S.C. § 1255(a) (1964) in section 1252 proceedings are denied alien crewmen, they may be permitted to depart voluntarily to a country of their choice under section 1252(b), and, perhaps, also under section 1254(d). Matter of Vara-Rodriguez, 10 I.&N. 113 (1962).

Moreover, if an alien crewman is finally ordered deported in a section 1252 proceeding, "his deportation will in the first instance be directed pursuant to section 243(a) of the Act [8 U.S.C. § 1253(a)] to the country designated by him." 8 C.F.R. § 242.17(c). If that country will not accept him, and he is to be deported to another country selected in accordance with section 1253(a), he may apply for temporary withholding of deportation to the latter country under section 1253(h) on the ground that in that country he would be subject to persecution on account of race, religion, or political opinion.[16] His claim is considered by a special inquiry officer—an official having special competence and relatively independent status—in a proceeding carefully designed to guarantee a hearing that is both full and fair,

15. Foti v. Immigration & Naturalization Service, 375 U.S. 217, 227 n. 13, 84 S.Ct. 306, 11 L.Ed.2d 281 (1963).

16. Section 1253(h) applies to "any alien within the United States." We have stated our reasons for concluding that alien crewmen who have landed under § 1282

(b) permits are within this description. See text at notes 4–6.

Subsections (c) and (d) of § 1253 contain express references to alien crewmen granted "conditional permit[s] to land temporarily" under § 1282(a).

followed by a decision subject to administrative as well as judicial review.[17]

For these reasons we hold that the order of the District Director entered after the departure of appellant's vessel was not authorized by section 1282(b), and that appellant may be deported only in accordance with sections 1251 and 1252 of the Act.

Since the standard applied in any proceedings that may hereafter be had upon an application by appellant under section 1253(h) of the Act will necessarily be that provided by the statute as it now reads, we need not consider whether or not the District Director applied that standard in past proceedings.

The government expresses concern that the interpretation we place upon section 1282(b), plus the availability of judicial review of summary decisions revoking landing permits and ordering the removal of crewmen, will render section 1282(b) useless for any purpose even when properly invoked while a crewman's vessel is still in port. But as the district court demonstrated in this case, no great delay need be involved in the disposition of applications for relief,[18] and stays are not automatic either in the trial court or here. If the challenge to a section 1282(b) order is not substantial, enforcement of the order need not be substantially delayed. If the order appears to violate constitutional or statutory limitations, delay is obviously justified.

Reversed and remanded.

17. Nothing we have said is intended to suggest that § 1252(b) proceedings are required when an alien crewman makes a claim of possible persecution in circumstances where § 1282(b) does apply. See Kordic v. Esperdy, 386 F.2d 232, 238 (2d Cir. 1967); Glavic v. Beechie, 340 F.2d 91 (5th Cir. 1964), affirming 225 F.Supp. 24 (S.D.Texas 1963). Cf. United States ex rel. Dolenz v. Shaughnessy, 200 F.2d 288, 288–289 (2d Cir. 1952); 1 Gordon &

Rosenfield, Immigration Law & Procedure § 5.166 at 5–127 (1967).

18. Appellant's complaint was filed on the day the District Director's order was entered. The district court issued an order to show cause on the same day, returnable the following morning. The hearing was held as noticed, and an order denying relief was entered in the course of the same day.