# IMMIGRATION AND NATURALIZATION SERVICE *v.* STANISIC.

No. 297.   Argued February 25, 1969.—Decided May 19, 1969.

*Joseph J. Connolly* argued the cause for petitioner, *pro hac vice.* With him on the brief were *Solicitor General Griswold, Assistant Attorney General Vinson,* and *Philip R. Monahan.*

*G. Bernard Fedde,* by appointment of the Court, 393 U. S. 1010, argued the cause for respondent. With him on the brief was *Dorothy McCullough Lee.*

*Edward J. Ennis* and *Melvin L. Wulf* filed a brief for the American Civil Liberties Union as *amicus curiae* urging affirmance.

MR. JUSTICE HARLAN delivered the opinion of the Court.

This case involves the type of hearing to which an alien crewman is entitled on his claim that he would suffer persecution upon deportation to his native land. The Court of Appeals sustained the respondent crewman's contention that he must be heard by a special inquiry officer [1] in a proceeding conducted under § 242 (b) of the Immigration and Nationality Act.[2] Petitioner, the

---

[1] A special inquiry officer is "any immigration officer who the Attorney General deems specially qualified to conduct specified classes of proceedings . . . ." Immigration and Nationality Act, § 101 (b)(4), 66 Stat. 171, 8 U. S. C. § 1101 (b)(4). The special inquiry officer has no enforcement duties. He performs "no functions other than the hearing and decision of issues in exclusion and deportation cases, and occasionally in other adjudicative proceedings." 1 C. Gordon & H. Rosenfield, Immigration Law and Procedure § 5.7b, at 5–49 (1967); see generally *id.*, § 5.7.

[2] 66 Stat. 209, 8 U. S. C. § 1252 (b):

"A special inquiry officer shall conduct proceedings under this section to determine the deportability of any alien, and shall administer oaths, present and receive evidence, interrogate, examine, and cross-examine the alien or witnesses, and, as authorized by the Attorney General, shall make determinations, including orders of deportation. . . . No special inquiry officer shall conduct a proceeding in any case under this section in which he shall have participated in investigative functions or in which he shall have participated (except as provided in this subsection) in prosecuting functions. Proceedings before a special inquiry officer acting under the provisions of this section shall be in accordance with such regulations, not inconsistent with this Act, as the Attorney General shall prescribe. Such regulations shall include requirements that—

"(1) the alien shall be given notice, reasonable under all the circumstances, of the nature of the charges against him and of the time and place at which the proceedings will be held;

"(2) the alien shall have the privilege of being represented (at no

Immigration and Naturalization Service, argues that respondent's claim was properly heard and determined by a district director.[3] We brought the case here, 393 U. S. 912 (1968), to resolve the conflict on this score between the decision below and that of the Court of Appeals for the Second Circuit in *Kordic* v. *Esperdy,* 386 F. 2d 232 (1967).

## I.

Respondent, a national of Yugoslavia, was a crewman aboard the Yugoslav vessel, M/V *Sumadija,* when it docked at Coos Bay, Oregon, in late December 1964. He requested and was issued a "D–1" conditional landing permit, in accordance with 8 CFR § 252.1 (d)(1) and § 252 (a)(1) of the Immigration and Nationality Act.[4] Under these provisions, the Service may allow a nonimmigrant alien crewman temporary shore leave for

> "the period of time (not exceeding twenty-nine days) during which the vessel or aircraft on which he arrived remains in port, if the immigration officer is

---

expense to the Government) by such counsel, authorized to practice in such proceedings, as he shall choose;

"(3) the alien shall have a reasonable opportunity to examine the evidence against him, to present evidence in his own behalf, and to cross-examine witnesses presented by the Government; and

"(4) no decision of deportability shall be valid unless it is based upon reasonable, substantial, and probative evidence.

"The procedure so prescribed shall be the sole and exclusive procedure for determining the deportability of an alien under this section."

[3] A district director is the officer in charge of a district office of the Immigration and Naturalization Service. He performs a wide range of functions. See 1 C. Gordon & H. Rosenfield, Immigration Law and Procedure § 1.9c (1967); 8 CFR § 103.1 (f).

[4] Section 252 (a), 66 Stat. 220, 8 U. S. C. § 1282 (a) provides:

"No alien crewman shall be permitted to land temporarily in the United States except as provided in this section . . . . If an immigration officer finds upon examination that an alien crewman is a

satisfied that the crewman intends to depart on the vessel or aircraft on which he arrived." *Ibid.*

On January 6, 1965, while on shore leave, respondent appeared at the Portland, Oregon, office of the Immigration and Naturalization Service. He claimed that he feared persecution upon return to Yugoslavia, and he flatly stated that he would not return to the M/V *Sumadija.* On the basis of the latter statement, and in accordance with § 252 (b) of the Act, the District Director revoked respondent's landing permit. Section 252 (b) provides:

"[A]ny immigration officer may, in his discretion, if he determines that an alien . . . does not intend to depart on the vessel or aircraft which brought him, revoke the conditional permit to land which was granted such crewman under the provisions of subsection (a)(1), take such crewman into custody, and require the master or commanding officer of the vessel or aircraft on which the crewman arrived to receive and detain him on board such

nonimmigrant . . . and is otherwise admissible and has agreed to accept such permit, he may, in his discretion, grant the crewman a conditional permit to land temporarily pursuant to regulations prescribed by the Attorney General, subject to revocation in subsequent proceedings as provided in subsection (b), and for a period of time, in any event, not to exceed—

"(1) the period of time (not exceeding twenty-nine days) during which the vessel or aircraft on which he arrived remains in port, if the immigration officer is satisfied that the crewman intends to depart on the vessel or aircraft on which he arrived; or

"(2) twenty-nine days, if the immigration officer is satisfied that the crewman intends to depart, within the period for which he is permitted to land, on a vessel or aircraft other than the one on which he arrived."

"D–1" and "D–2" landing permits are permits issued pursuant to 8 CFR §§ 252.1 (d)(1) and 252.1 (d)(2), which implement §§ 252 (a)(1) and 252 (a)(2) of the Act.

vessel or aircraft, if practicable, and such crewman shall be deported from the United States at the expense of the transportation line which brought him to the United States. . . . Nothing in this section shall be construed to require the procedure prescribed in section 242 of this Act to [*sic*] cases falling within the provisions of this subsection."

Section 252 (b) makes no express exception for an alien whose deportation would subject him to persecution. However, § 243 (h) permits the Attorney General to withhold the deportation of any alien to a country in which he would be subject to persecution, and analogously, 8 CFR § 253.1 (e) then provided: [5]

"Any alien crewman . . . whose conditional landing permit issued under § 252.1 (d)(1) of this chapter is revoked who alleges that he cannot return to a Communist, Communist-dominated, or Communist-occupied country because of fear of persecution in that country on account of race, religion, or political opinion may be paroled into the United States . . . for the period of time and under the conditions set by the district director having jurisdiction over the area where the alien crewman is located."

Thus, although respondent was admittedly deportable under the terms of § 252 (b), he was not immediately returned to his vessel. On January 7, he was offered the opportunity to present evidence to the District Director in support of his claim of persecution.

Respondent presented no evidence to the District Director. Rather, he contended that he had not been given sufficient time to prepare for the hearing, and he also argued that he was entitled to have his claim heard

---

[5] 26 Fed. Reg. 11797 (December 8, 1961). Effective March 22, 1967, the section was amended and redesignated § 253.1 (f), 32 Fed. Reg. 4341–4342.

by a special inquiry officer in accordance with the general provisions of § 242 (b). The District Director ruled against respondent and, in the absence of any evidence of probable persecution, ordered him returned to the M/V *Sumadija,* which was then still in port.

Respondent immediately sought relief in the United States District Court for the District of Oregon,[6] which, without opinion, temporarily stayed his deportation and referred the matter back to the District Director for a hearing on the merits of respondent's claim. On January 25, 1965, after a hearing at which respondent was represented by counsel and presented evidence, the District Director held that respondent "has [not] shown that he would be physically persecuted if he were to return to Yugoslavia." Appendix 22.

On respondent's supplemental pleadings, the District Court held that the District Director's findings were supported by the record. The court rejected respondent's claim that he was entitled to a § 242 (b) hearing before a special inquiry officer, relying on the last sentence of § 252 (b), which provides: "Nothing in this section shall be construed to require the procedure prescribed in section 242 of this Act to cases falling within the provisions of this subsection." *Vucinic [and Stanisic]* v. *Immigration Service,* 243 F. Supp. 113 (1965).

Respondent did not appeal the District Court's decision. Instead, in July 1965, he petitioned Congress for a private bill, pending action on which the Service stayed his deportation. Respondent's effort proved unsuccessful, and on June 21, 1966, the Service ordered him to appear for deportation to Yugoslavia.

---

[6] Because the District Director's determination was not pursuant to § 242 (b), the District Court had jurisdiction to review his action. See *Cheng Fan Kwok* v. *Immigration Service,* 392 U. S. 206 (1968); *Stanisic* v. *Immigration Service,* 393 F. 2d 539, 542 (1968); *Vucinic [and Stanisic]* v. *Immigration Service,* 243 F. Supp. 113, 115–117 (1965); 5 U. S. C. § 1009.

The following day, respondent reasserted his claim of persecution before the Service, and requested that the matter be heard by a special inquiry officer pursuant to § 242. The Service, and subsequently the District Court, denied relief, both holding that this issue had previously been determined adversely to respondent.

The Court of Appeals for the Ninth Circuit reversed, *Stanisic* v. *Immigration Service*, 393 F. 2d 539 (1968), holding that the matter was not *res judicata* because of a significant change of circumstances: the District Director's adverse determination in 1965, and the District Court's unappealed approval thereof, were based on the unstated premise that the M/V *Sumadija* was still in port;[7] but now the ship had long since sailed, and respondent still had not been deported. The court held that § 252 (b) only authorized respondent's "summary deportation aboard the vessel on which he arrived or, within a very limited time after that vessel's departure, aboard another vessel pursuant to arrangements made before . . . [his] vessel departed." 393 F. 2d, at 542–543. Since neither of these conditions was met, respondent could no longer be deported pursuant to the District Director's 1965 determination; he was entitled to a *de novo* hearing before a special inquiry officer under § 242 (b) of the Act.

## II.

At the outset, it is important to recognize the distinction between a determination whether an alien is statutorily deportable—something never contested by

[7] Actually, the ship sailed from the United States on or about January 16, 1965, or between the date on which the District Director revoked respondent's landing permit (January 6, 1965), and the date on which, after a hearing, he denied respondent's persecution claim (January 25, 1965). This fact was not in the record before the Court of Appeals.

respondent—and a determination whether to grant political asylum to an otherwise properly deportable alien.

Section 242 (b) provides a generally applicable procedure "for determining the deportability of an alien . . . ." Section 252 (b) provides a specific procedure for the deportation of alien crewmen holding D–1 landing permits. Neither of these sections is concerned with the granting of asylum.

Relief from persecution, on the other hand, is governed by §§ 212 (d)(5) and 243 (h). The former section authorizes the Attorney General, in his discretion, to

> "parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States . . . ."

The latter authorizes the Attorney General

> "to withhold deportation of any alien within the United States to any country in which in his opinion the alien would be subject to persecution on account of race, religion, or political opinion and for such period of time as he deems to be necessary for such reason."

No *statute* prescribes by what delegate of the Attorney General, or pursuant to what procedure, relief shall be granted under these provisions. By *regulation,* the decision to grant parole pursuant to § 212 (d)(5) rests with a district director, 8 CFR §§ 212.5 (a), 253.2; and by regulation, the decision to withhold deportation of *most* aliens pursuant to § 243 (h) is presently made by a special inquiry officer.[8]  8 CFR §§ 242.8 (a), 242.17 (c).

---

[8] This was not always so. Until 1962, the final determination was made by a regional commissioner of the Service. 8 CFR § 243.3 (b)(2) (1958 rev.); see *Foti* v. *Immigration Service,* 375 U. S. 217, 230, n. 16 (1963).

Prior to 1960, no regulation provided relief to an alien crewman whose D–1 landing permit was revoked but who claimed that return to his country would subject him to persecution. In *Szlajmer* v. *Esperdy,* 188 F. Supp. 491 (1960), a district court held that a crewman in this situation was entitled to be heard. The Service responded by promulgating 8 CFR § 253.1 (e), *supra,* at 67, the regulation which it applied in the case at bar. 8 CFR § 253.1 (e) is a hybrid. The grounds for relief are, for present purposes, identical to those of § 243 (h) of the Act.[9] However, because the Service adheres to the view that a crewman whose D–1 permit has been revoked is not "within the United States" in the technical sense of that phrase, see *Leng May Ma* v. *Barber,* 357 U. S. 185 (1958), it terms the relief "parole" into the United States rather than "withholding deportation." Whatever terminological and conceptual differences may exist, the substance of the relief is the same.[10]

The Service could provide that *all* persecution claims be heard by a district director, and we see no reason why the Service cannot validly provide that the persecution claim of an alien crewman whose D–1 landing permit has been revoked be heard by a district director, whether or not the ship has departed. It might be argued, however, that the Service has not done so; that 8 CFR § 253.1 (e) was designed to govern the determination of persecution claims only when § 252 (b) of the Act governed determinations of deportability; and that if de-

---

[9] The only substantial difference is that the regulation, but not the statute, is limited to Communist-inspired persecution.

[10] For this reason, we have no occasion to decide whether or not respondent was "within the United States." Compare *Szlajmer* v. *Esperdy,* 188 F. Supp. 491 (1960), with *Kordic* v. *Esperdy,* 386 F. 2d 232 (1967), and *Glavic* v. *Beechie,* 225 F. Supp. 24 (1963), aff'd, 340 F. 2d 91 (1964). It may further be noted that § 243 (h), by its terms, "authorizes" but does not require the consideration of persecution claims.

parture of the vessel renders § 252 (b) inapplicable (a suggestion we consider and reject in Part III, below), then 8 CFR § 253.1 (e) likewise becomes inapplicable.

Section 253.1 (e) applies, however, to "[a]ny alien crewman . . . whose conditional landing permit issued under § 252.1 (d)(1) [of 8 CFR] . . . is revoked"—precisely respondent's situation—and makes no reference to the departure, *vel non*, of the vessel. Granting that this regulation and its successor provision are not free from ambiguity, we find it dispositive that the agency responsible for promulgating and administering the regulation has interpreted it to apply even when the vessel has departed. *E. g., Kordic v. Esperdy,* 386 F. 2d 232 (1967); *Glavic v. Beechie,* 225 F. Supp. 24 (1963), aff'd, 340 F. 2d 91 (1964). "[T]he ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Bowles v. Seminole Rock Co.,* 325 U. S. 410, 414 (1945).

In sum, it is immaterial to the decision in this case whether § 252 (b)'s exception to the § 242 (b) procedure is, or is not, applicable to respondent. These two provisions govern only the revocation of temporary landing permits and the determination of deportability, and we reiterate that respondent does not contest the District Director's action on either of these scores. These sections do not state who should hear and determine a request for asylum. That is a matter governed by regulation, and under the applicable regulation the respondent received his due.

## III.

We do not rest on this ground alone, however. Both the court below and the Court of Appeals for the Second Circuit in *Kordic v. Esperdy,* 386 F. 2d 232 (1967), assumed that a crewman's statutory entitlement to a

§ 242 (b) hearing on his request for asylum was co-extensive with his right to a § 242 (b) hearing on his statutory deportability, and the case was argued here primarily on that basis. For the balance of the opinion we thus make, *arguendo,* the same assumption. We conclude, contrary to the court below, that an alien crewman may properly be deported pursuant to § 252 (b) even after his ship has sailed.

### A.

Section 242 (b) of the Immigration and Nationality Act provides a generally applicable administrative procedure pursuant to which a special inquiry officer determines whether an alien is deportable. See nn. 1 and 2, *supra.*

The history of § 252 (b)'s narrow exception to the § 242 (b) deportation procedure is found in the Report of the Senate Committee on the Judiciary, S. Rep. No. 1515, 81st Cong., 2d Sess., which preceded the enactment of the Immigration and Nationality Act. Alien crewmen had traditionally been granted the privilege of temporary admission or shore leave "because of the necessity of freeing international commerce from unnecessary barriers and considerations of comity with other nations . . . ." *Id.,* at 546. A serious problem was created, however, by alien crewmen who deserted their ships and secreted themselves in the United States. The Committee found that:

> "[T]he temporary 'shore leave' admission of alien seamen who remain illegally constitutes one of the most important loopholes in our whole system of restriction and control of the entry of aliens into the United States. The efforts to apprehend these alien seamen for deportation are encumbered by many technicalities invoked in behalf of the alien seamen

and create conditions incident to enforcement of the laws which have troubled the authorities for many years." *Id.*, at 550.

To ameliorate this problem, the Committee recommended that:

> "Authority should be granted to immigration officers in a case where the alien crewman intends to depart on the same vessel on which he arrived, upon a satisfactory finding that an alien is not a bona fide crewman, to revoke the permission to land temporarily, to take the alien into custody, and to require the master of the vessel on which he arrived to detain him and remove him from the country." *Id.*, at 558.

Unlike § 242 (b), § 252 (b) does not prescribe the procedures governing the determination of the crewman's deportability, nor does it confine that determination to a special inquiry officer.

### B.

As the Court of Appeals noted, the § 252 (b) procedure governs a narrow range of cases only. It is entirely inapplicable to persons other than alien crewmen. It does not apply to an alien crewman who enters the United States illegally without obtaining any landing permit at all, or who enters on a "D–2" permit allowing him to depart on a different vessel. See n. 4, *supra.* The Service has held § 252 (b) to be inapplicable even to a crewman issued a D–1 permit unless formal revocation—as distinguished from actual deportation—takes place before his vessel leaves American shores.[11] *Matter of M——*, 5 I. & N. Dec. 127 (1953); 8 CFR § 252.2; see

---

[11] This is responsive to the language of §252 (b). Permission to land terminates upon the vessel's departure, and thereafter there is nothing to "revoke."

*Cheng Fan Kwok* v. *Immigration Service,* 392 U. S. 206, 207 (1968).

Section 252 (b) most plainly governs the situation in which a D–1 landing permit is revoked and the alien crewman is immediately returned to the vessel on which he arrived, which, by hypothesis, is still in a United States port. At the time of revocation, the crewman usually has not traveled far from the port,[12] so the burden of transporting him back to the vessel is small; there is a readily identifiable vessel and place to return him to; and during his brief shore leave, which cannot exceed 29 days, the crewman is unlikely to have established significant personal or business relationships in the United States. In short, the crewman's deportation may be expedited, with minimum hardship and inconvenience to him, to the transportation company responsible for him,[13] and to the Service.

That this is not the only situation to which the § 252 (b) procedure applies, however, is evident from the language of § 252 (b) itself and the related provisions of § 254.[14] Section 252 (b) requires that where an alien crewman's landing permit is revoked his transportation company must detain him aboard the vessel on which he arrived, and deport him. Section 254 (a) imposes a fine on the company and ship's master, *inter alia,*

---

[12] 8 CFR § 252.2 (d) provides that a "crewman granted a conditional permit to land under section 252 (a) (1) of the Act . . . is required to depart with his vessel from its port of arrival and from each other port in the United States to which it thereafter proceeds coastwise without touching at a foreign port or place; however, he may rejoin his vessel at another port in the United States before it touches at a foreign port or place if he has advance written permission from the master or agent to do so." In the latter case the crewman may journey some distance from the port at which he arrived.

[13] See *infra,* this page and at 76.

[14] 66 Stat. 221, 8 U. S. C. § 1284.

for failure to detain or deport the crewman "if required to do so by an immigration officer." However, § 252 (b)'s requirement is modified by the term, *"if practicable";* and § 254 (c) correlatively provides:

> "If the Attorney General finds that deportation of an alien crewman . . . on the vessel or aircraft on which he arrived is impracticable or impossible, or would cause undue hardship to such alien crewman, he may cause the alien crewman to be deported from the port of arrival or any other port on another vessel or aircraft of the same transportation line, unless the Attorney General finds this to be impracticable."

These provisions contemplate that an alien crewman whose temporary landing permit is revoked pursuant to § 252 (b) may be deported on a vessel other than the one on which he arrived. The other vessel should preferably be one owned by the transportation company which brought him to the United States,[15] but if this is not feasible, the Attorney General may order him deported by other means, at the company's expense.

The Court of Appeals recognized that an alien crewman might properly be deported on a vessel other than the one which brought him. It noted, however, that § 254 (c) holds the owner of that vessel responsible for all of the expenses of his deportation and further provides that the vessel shall not be granted departure clearance until those expenses are paid or their payment is guaranteed.[16] From this it concluded that "the section

---

[15] This is doubtless an accommodation made in the light of the transportation company's liability for the expenses of deportation.

[16] "All expenses incurred in connection with such deportation, including expenses incurred in transferring an alien crewman from one place in the United States to another under such conditions and safeguards as the Attorney General shall impose, shall be paid by the owner or owners of the vessel or aircraft on which the alien

contemplates that the alternative arrangement shall be made while the vessel upon which the crewman arrived is still in port . . . ." 393 F. 2d, at 546. Since arrangements for respondent's deportation had not been made before the M/V *Sumadija* departed, the § 254 (c), and hence the § 252 (b), procedures were no longer applicable: with the ship's departure, respondent became entitled to a hearing pursuant to § 242 (b).

We agree that the "clearance" provision of § 254 (c) contemplates that the crewman's departure on another vessel may *sometimes* be accomplished or arranged before the vessel that brought him departs. If, however, the crewman's vessel sails before its owner has paid or guaranteed the expenses of deportation, the owner's liability under § 254 (c) is in no way diminished. The Government has merely lost a useful means of compelling payment of costs which may still be collected by other methods.[17] Indeed, as the Court of Appeals itself noted, § 254 (c)'s financial responsibility provision is not limited to instances of deportation pursuant to § 252 (b), but applies to the deportation of alien crewmen in a variety of situations, including those in which a § 242 (b) proceeding has been held, and thus those in which the crewman's vessel may long since have departed.[18]

Strong policies support the conclusion that a properly commenced § 252 (b) proceeding does not automatically

---

arrived in the United States. The vessel or aircraft on which the alien arrived shall not be granted clearance until such expenses have been paid or their payment guaranteed to the satisfaction of the Attorney General. . . ." § 254 (c).

[17] Thus, if and when respondent is deported, the owners of the M/V *Sumadija* will be responsible for the related expenses incurred by the United States.

[18] And, although we do not decide this question, § 254 (c) would appear to allow the Attorney General to require security for the payment of anticipated expenses of deporting an alien crewman, even though no final arrangements have been made before the vessel that brought him departs.

abort upon the departure of the crewman's vessel. If the crewman whose landing permit has been revoked pursuant to § 252 (b) attacks the district director's action in a federal court, the court would usually stay his deportation pending at least a preliminary hearing. Even courts with dockets less crowded than those of most of our major port cities [19] may not be able to hear the matter for several days or more, during which time the vessel may often have departed according to schedule. It requires little legal talent, moreover, to manufacture a colorable case for a temporary stay out of whole cloth, and to delay proceedings once in the federal courts. The Ninth Circuit's construction would, thus, encourage frivolous applications and intentional delays designed to assure that the crewman's vessel departed before the case was heard. Alternatively, it would so dispose federal judges not to grant stays that persons presenting meritorious applications might be deported without the opportunity to be heard.

We agree with the court below that § 252 (b) is a provision of limited applicability. But we conclude that the court's construction would restrict its scope to a degree neither intended by Congress nor supported by the language of the Act, and that it would, as a practical matter, render § 252 (b) useless for the very function it was designed to perform.

We hold that an alien crewman whose temporary landing permit is properly revoked pursuant to § 252 (b) does not become entitled to a hearing before a special inquiry officer under § 242 (b) merely because his deportation is not finally arranged or effected when his vessel leaves, and that under these circumstances the Attorney General

---

[19] See generally 1968 Director of the Administrative Office of the United States Courts Ann. Rep., Tables C, D, and X (1968).

may provide—as he did in 8 CFR § 253.1 (e), now 8 CFR § 253.1 (f)—that the crewman's request for political asylum be heard by a district director of the Immigration and Naturalization Service.

## IV.

At the time of respondent's January 1965 hearing before the District Director, § 243 (h) of the Immigration and Nationality Act provided:

> "The Attorney General is authorized to withhold deportation of any alien within the United States to any country in which in his opinion the alien would be subject to *physical persecution* . . . ." [20]
> (Emphasis added.)

By the Act of October 3, 1965, § 11 (f), 79 Stat. 918, this section was amended by substituting for "physical persecution" the phrase "persecution on account of race, religion, or political opinion." Although 8 CFR § 253.1 (e), the regulation under which respondent's 1965 hearing was conducted, did not itself contain any restriction to "physical persecution," it is apparent from the District Director's findings that he read such a limitation into the regulation.[21]

We believe, therefore, that it is appropriate that respondent be given a new hearing before the District Director under the appropriate standard, and we remand the case for that purpose.[22]

---

[20] 66 Stat. 214.

[21] See *supra,* at 68; Appendix 18–22 *passim.*

[22] Respondent contends that his 1965 proceeding was infected with various constitutional errors, including the District Director's alleged bias and his combination of prosecutorial, investigative, and adjudicatory functions. Because that proceeding is not before us, and because we remand for a new hearing, we have no occasion to consider these arguments, except to note that neither § 252 (b) of the

The judgment of the United States Court of Appeals for the Ninth Circuit is reversed and the case is remanded to that court for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE BLACK, with whom MR. JUSTICE DOUGLAS and MR. JUSTICE MARSHALL join, dissenting.

Two procedures for the deportation of aliens are relevant in this case. The first is set forth in § 242 (b) of the Immigration and Nationality Act, 66 Stat. 209, 8 U. S. C. § 1252 (b), and is the procedure required in most instances when the Government seeks to deport an alien. Under § 242 (b) a number of procedural safeguards are specified to insure that an alien is given the full benefit of a complete and fair hearing before the harsh consequence of deportation can be imposed on him.[1] The second procedure involved in this case is set

---

Immigration and Nationality Act nor 8 CFR § 253.1 (f), under which respondent will be heard on remand, is unconstitutional on its face. Likewise, it is premature to consider whether, and under what circumstances, an order of deportation might contravene the Protocol and Convention Relating to the Status of Refugees, to which the United States acceded on November 1, 1968. See Dept. State Bull., Vol. LIX, No. 1535, p. 538.

[1] Section 242 (b) provides as follows:

"A special inquiry officer shall conduct proceedings under this section to determine the deportability of any alien, and shall administer oaths, present and receive evidence, interrogate, examine, and cross-examine the alien or witnesses, and, as authorized by the Attorney General, shall make determinations, including orders of deportation. . . . No special inquiry officer shall conduct a proceeding in any case under this section in which he shall have participated in investigative functions or in which he shall have participated (except as provided in this subsection) in prosecuting functions. Proceedings before a special inquiry officer acting under the provisions of this section shall be in accordance with such regulations, not incon-

forth in § 252 (b). It is applicable only under very special circumstances involving alien seamen who enter this country under conditional landing permits. Section 252 (b) provides for a short, summary procedure.[2] Unlike § 242 (b), the first provision mentioned, this second provision does not require that the hearing officer be someone unconnected with the investigation and prosecution of the case. It does not require specific trial safeguards such as the rights to notice, counsel, and cross-

---

sistent with this Act, as the Attorney General shall prescribe. Such regulations shall include requirements that—

"(1) the alien shall be given notice, reasonable under all the circumstances, of the nature of the charges against him and of the time and place at which the proceedings will be held;

"(2) the alien shall have the privilege of being represented (at no expense to the Government) by such counsel, authorized to practice in such proceedings, as he shall choose;

"(3) the alien shall have a reasonable opportunity to examine the evidence against him, to present evidence in his own behalf, and to cross-examine witnesses presented by the Government; and

"(4) no decision of deportability shall be valid unless it is based upon reasonable, substantial, and probative evidence.

"The procedure so prescribed shall be the sole and exclusive procedure for determining the deportability of an alien under this section."

[2] Section 252 (b) provides as follows:

"Pursuant to regulations prescribed by the Attorney General, any immigration officer may, in his discretion, if he determines that an alien is not a bona fide crewman, or does not intend to depart on the vessel or aircraft which brought him, revoke the conditional permit to land which was granted such crewman under the provisions of subsection (a) (1), take such crewman into custody, and require the master or commanding officer of the vessel or aircraft on which the crewman arrived to receive and detain him on board such vessel or aircraft, if practicable, and such crewman shall be deported from the United States at the expense of the transportation line which brought him to the United States. Until such alien is so deported, any expenses of his detention shall be borne by such transportation company. Nothing in this section shall be construed to require the procedure prescribed in section 242 of this Act to cases falling within the provisions of this subsection."

examination of witnesses. Indeed, § 252 (b) apparently does not require that the alien be given any hearing at all but would seem to authorize an immigration officer to order immediate arrest and summary deportation on the basis of any information coming to him in any way at any time. The question before the Court is therefore not the apparently insignificant question suggested by the Court's opinion—namely, whether this alien's case was properly determined by an official with one title, "District Director," rather than another title, "special inquiry officer." Instead, the question is the crucially significant one whether an alien seaman about to be forced to leave the country is entitled under the circumstances of this case to the benefit of safeguards that were carefully provided by Congress to insure greater fairness and reliability in deportation proceedings.

The regulations relied on by the Court in Part II of its opinion do not provide an independent basis for its holding. Among the relevant regulations, 8 CFR § 242.8 (a) applies "[i]n any proceeding conducted under this part," namely "Part 242—Proceedings to Determine Deportability of Aliens in the United States: Apprehension, Custody, Hearing, and Appeal." The regulation is thus designed to spell out further the details of proceedings required to be conducted under § 242 of the statute, and this regulation explicitly authorizes the special inquiry officer "to order temporary withholding of deportation pursuant to section 243 (h) of the Act [the political persecution provision]." In contrast, the regulations relied upon by the Court as authorizing a District Director to decide this issue, in particular former 8 CFR § 253.1 (e), apply by their own terms only to the procedure for "parole" of an alien under § 212 (d)(5), a remedy distinct from the withholding of deportation under § 243 (h), and by the Government's own admission these regulations are applicable only to "requests for asylum made

by crewmen against whom proceedings under Section 252 (b) have been instituted." Brief for Petitioner 37. Thus, the regulations serve only to spell out the procedures to be followed under both § 242 (b) and § 252 (b) and do not even purport to specify when one of these sections rather than the other is in fact applicable. The fact that the Immigration and Naturalization Service has applied the regulation differently does not change this meaning. As the Court concedes, the regulation is "not free from ambiguity," *ante,* at 72, and of course the ambiguity in the regulation is precisely the same as the ambiguity in the statutory provision from which the wording of the regulation was drawn. It seems clear that the way in which the Service has applied the regulation has been determined by its interpretation of the statute, an interpretation that is in no way binding on us. Both the statute and the regulation are ambiguous, and there is no doubt in my mind that this ambiguity should be resolved in favor of the alien who is seeking a full and fair hearing. With all due respect, I think the Court's involved argument based upon the regulations, which goes beyond anything suggested by the Government itself in this case, provides no basis whatsoever for avoiding the fundamental question of statutory interpretation as to which of the two procedures, § 242 (b) or § 252 (b), was required to be followed in this case.

The Government contends that respondent, the alien seaman involved here, could be properly deported under the special summary procedures of § 252 (b) because his conditional landing permit was revoked and because § 252 (b) authorizes summary deportation after this permit is revoked. Respondent, however, argued in the Court of Appeals that he should have been given the benefit of the careful hearing procedures spelled out by Congress in § 242 (b) because the ship on which he came had departed before the decision of the District

Director was made, and therefore the only justification for the fast but ordinarily less desirable procedure of § 252 (b) no longer existed. The Court of Appeals held that § 252 (b) proceedings were authorized only prior to the departure of the ship. I agree with the Court of Appeals. As that court noted in its opinion:

"The section [252 (b)] exception [to the general procedural requirements of § 242 (b)] is very narrowly drawn. It does not apply to the deportation of crewmen who have 'jumped ship' and entered the United States illegally, with no permit at all. As noted above, it does not apply to crewmen issued landing permits authorizing them to depart on vessels other than those on which they arrived. It does not apply to crewmen who have overstayed the twenty-nine day leave period without revocation of their landing permits. It does not apply to crewmen who were to leave on the vessel on which they arrived if their vessels have departed before their landing permits are revoked. In all of these situations crewmen may be deported only in accordance with [§ 242 (b)] procedures." 393 F. 2d 539, 544.

As the legislative history of the Act, quoted in the opinion of the Court of Appeals, shows, the special truncated procedure of § 252 (b) was intended to be used only when the need for speed was truly pressing—when the ship was about to leave port. But the seaman in this case was subjected to this truncated, summary procedure even though his ship had already gone and the need for haste in completing these important legal proceedings no longer existed. There is no reason to suspect that Congress wanted a seaman to be deprived under these circumstances of the vital procedural safeguards so carefully specified in § 242 (b) of the Act.

I would affirm the judgment of the Court of Appeals.