571 F.2d 95
 NEW YORK STATE COMMISSION ON CABLE TELEVISION, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
New York State Cable Television Association and Manhattan
Cable TV, Inc., Intervenors.
 No. 113, Docket 77-4079.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 2, 1977.
Decided Jan. 25, 1978.
 
 Philip Weinberg, Asst. Atty. Gen., New York City (Louis J. Lefkowitz, Atty. Gen. of the State of New York, Samuel A. Hirshowitz, First Asst. Atty. Gen., New York City, of counsel), for petitioner.
 Gregory M. Christopher, Washington, D. C. (John H. Shenefield, Asst. Atty. Gen., Daniel M. Armstrong, Associate Gen. Counsel, Robert B. Nicholson, Peter Delacruz, Washington, D. C., of counsel), for respondent FCC.
 David W. Smith, Pryor, Cashman, Sherman & Flynn, New York City (Joseph Z. Epstein and Sandra L. Grayson, Pryor, Cashman, Sherman & Flynn, New York City, W. Theodore Pierson, Jr., and Benjamin J. Griffin, Pierson, Ball & Dowd, Washington, D. C., of counsel), for intervenor Manhattan Cable TV, Inc.
 Robert S. Smith, Paul, Weiss, Rifkind, Wharton & Garrison, New York City (Stuart Robinowitz and Susan P. Carr, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, of counsel), for intervenor New York State Cable Television Association.
 Before FRIENDLY, HAYS and OAKES, Circuit Judges.
 OAKES, Circuit Judge:
 
 
 1
 This petition for review[1] requires our construction of a 1972 Federal Communications Commission (FCC) regulation (Regulation or Section 76.31(b)) limiting combined state and local franchise fees imposed upon cable television (CTV) systems.[2] Those systems in operation prior to March 31, 1972, were "grandfathered" under the Regulation. The controversy centers on the parameters of this special treatment.
 
 
 2
 Read literally as petitioner, New York State Commission on Cable Television (State Commission), urges, the Regulation would permit combined state and local franchise fees of grandfathered systems to be increased without limit. The FCC and the intervenors (New York State Cable Television Association and Manhattan Cable TV, Inc.) construe the Regulation to allow combined fees in effect on the date of the Regulation to remain effective through a specified date,[3] even where those fees exceed the amount normally permitted under the Regulation, but not to permit an increase in the combined fees. Indeed, the FCC so held in New York State Commission on Cable Television, 59 FCC2d 1344 (1976) (hereinafter NYSCCT). On the State Commission's petition for reconsideration, the FCC adhered to its nonliteral interpretation of the Regulation, 62 FCC2d 975 (1977) (hereinafter NYSCCT Reconsideration). And in a subsequent rulemaking proceeding, the FCC reiterated its position.[4] 41 Pike & Fischer RR2d 885, 887, 901-06 (Sept. 30, 1977) (No. 21002).
 
 
 3
 * Factual Background
 
 
 4
 The Regulation is one product of a comprehensive, interrelated rulemaking proceeding which examined virtually all aspects of CTV service, including broadcast signal carriage, public access, technical standards and franchise standards.[5] The franchise fee limitation was promulgated in response to evidence that some municipalities were exacting fees far in excess of their costs of regulation. Some fees were as high as 40% Of gross subscriber revenues. Id. at 901. The limitation actually imposed 3% Without FCC approval, up to 5% With FCC approval on a showing of no interference with federal regulatory objectives and of appropriateness "in light of the planned local regulatory program," 47 C.F.R. § 76.31(b) (1976) was believed to "strike a balance that permits the achievement of federal goals and at the same time allows adequate revenues to defray the costs of local regulation."[6] CTV Report, 36 FCC2d at 209.
 
 
 5
 Prior to adoption of the Regulation, the municipalities of New York imposed fees on cable systems. After the Regulation was promulgated New York established a state commission on CTV to regulate the industry. N.Y.Exec.Law Art. 28, §§ 811-31 (McKinney Supp.1976). Section 817 of the Law initially imposed a franchise fee to cover those State Commission operating costs and expenses which exceeded appropriations received, with an outer limit of 1% Of gross annual receipts. This section was amended in 1975, raising the maximum fee to 2%. Certain CTV operators, including intervenor Manhattan Cable TV, refused to pay some or all of the state fee on the basis that the State's exaction could not be added to the grandfathered municipal fees already in excess of the 5% Maximum allowed by Section 76.31(b). The State Commission then sought a declaratory ruling from the FCC that collection of the 2% State fee was consistent with Section 76.31(b).
 
 
 6
 The original FCC decision held that because the state fee was imposed after adoption of the Regulation it was subject to the Regulation's limitations. NYSCCT, supra, 59 FCC2d at 1353. On reconsideration the FCC noted that the grandfather provision was adopted to avert minor dislocations and to protect reliance by operators and municipalities on franchise terms negotiated prior to the Regulation's promulgation. "That equitable concept," the FCC held, "would be destroyed if . . . the franchise fee were free to rise indiscriminately beyond its pre-1972 contract level." NYSCCT Reconsideration, supra, 62 FCC2d at 978 (footnote omitted).
 
 II
 Discussion
 
 7
 Petitioner argues vigorously that the plain meaning of the Regulation permits imposition of new state (and assumedly local) fees on systems operating before the Regulation's effective date, March 31, 1972. It is the systems that are grandfathered by the language of the Regulation, the argument runs, not the fees in existence on that date. Petitioner invokes the canon of construction that statutory and regulatory language, United States v. Miller, 303 F.2d 703, 707 (9th Cir. 1962), cert. denied, 371 U.S. 955, 83 S.Ct. 507, 9 L.Ed.2d 502 (1963), should be given its plain and ordinary meaning, particularly where the wording is unambiguous. Malat v. Riddell, 383 U.S. 569, 571-72, 86 S.Ct. 1030, 16 L.Ed.2d 102 (1966) ("primarily" in § 1221(1) of the Internal Revenue Code of 1954 given its ordinary meaning where literal reading is consistent with legislative purpose).
 
 
 8
 Mere incantation of the plain meaning rule, without placing the language to be construed in its proper framework, cannot substitute for a meaningful analysis. For we must remember Judge Learned Hand's stricture that "(t)here is no surer way to misread any document than to read it literally . . . ." Guiseppi v. Walling, 144 F.2d 608, 624 (2d Cir. 1944) (concurring), aff'd sub nom. Gemsco, Inc. v. Walling, 324 U.S. 244, 65 S.Ct. 605, 89 L.Ed. 921 (1945). And as Professor Cox wisely noted, "(n)o one has ever suggested that the courts must always follow the letter of a statute regardless of the outcome, nor does any one contend that the words may be entirely disregarded. The issue is where to strike the balance." Cox, Judge Learned Hand and the Interpretation of Statutes, 60 Harv.L.Rev. 370, 376 (1947). The appropriate methodology, then, is to look to the "common sense" of the statute or regulation, to its purpose, to the practical consequences of the suggested interpretations, and to the agency's own interpretation for what light each inquiry might shed. See United Housing Foundation, Inc. v. Forman,421 U.S. 837, 849, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975); United States v. American Trucking Associations, Inc., 310 U.S. 534, 543-44, 60 S.Ct. 1069, 84 L.Ed. 1345 (1940).
 
 
 9
 We first see that to grandfather "systems" without grandfathering their "fees" would not make much sense. The grandfather clause does not exist in a vacuum. The broad purpose of the franchise fee limitation was to check rising fees that were wholly unreasonable because they bore no relation to the costs of regulation,[7] thereby "burden(ing) cable television to the extent that it will be unable to carry out its part in our national communications policy." CTV Report, supra, 36 FCC2d at 209 (footnote omitted). The more limited objective of the grandfather clause was to "relieve both cable systems and local authorities of whatever minor dislocations our rules might otherwise cause," id. at 210. Absent a grandfather clause, the limitations imposed by Section 76.31(b) might well have necessitated renegotiation of franchises already granted (and accepted).[8]
 
 
 10
 What we are probably confronted with here is an inadvertent gap in the intent of the regulators: having never considered the possibility that either state or local authorities would increase fees on grandfathered systems where combined fees already exceeded the Regulation's limits prior to its adoption, the FCC did not explicitly preclude such increases in the Regulation. Even if the agency draftsmen contemplated that a locality no thought whatsoever seems to have been given to state franchise fees might seek to increase fees already in excess of the Regulation's limits, they may have thought that such an increase, at least if imposed by the franchise-granting community, would operate to terminate the existing franchise. See Clarification, 46 FCC2d at 197. Termination would thereby subject the franchise fee to the Regulation's limits automatically because the franchise would no longer enjoy grandfathered status. Thus only the imposition of a new state franchise fee or the increase of a preexisting one could operate to increase the burden on a grandfathered system. And as the State Commission itself points out, "no state regulatory commission even existed . . . in the cable television area" when the Regulation was adopted. Reply Brief for Petitioner at 2.
 
 
 11
 If we examine the practical consequences of the alternative interpretations proffered by the parties, each side conjures up a parade of horribles. None, however, seems as nightmarish as depicted. The State Commission argues that under the FCC's interpretation it is unclear whether the State must yield to franchising municipalities or vice versa: if the latter, grave problems of impairment of contracts may arise; if the former, state regulation of cable television will be largely preempted by municipal regulation. There are three responses to this suggested difficulty. First, any city-state conflict is a matter for the state courts. Second, if the State Commission is truly crippled in its regulatory efforts by the limitation, a wholly undocumented proposition, it may still seek a waiver, 47 C.F.R. § 76.7 (1976).[9] And finally, at least as of the effective date of the FCC's recent rulemaking procedure, the combined state-municipal fee on grandfathered systems has been increased from a percentage of customer subscriptions to a percentage of total system revenues.[10] Thus even though the percentages set forth in the Regulation remain the same, the broader revenue base yields greater dollar amounts for states and municipalities.
 
 
 12
 Similarly we are not fully persuaded by the intervenors' arguments that states and localities would have open season upon the grandfathered systems if the literal interpretation were to prevail. Any substantial fee increase would very likely terminate the existing franchises.[11] In addition, state commissions are subject to the presumably responsible acts of their own legislatures, and in any event are limited by future valid rulemaking proceedings.
 
 
 13
 The equities of this dispute must also be considered. Grandfathered systems are to some extent already discriminated against by virtue of the existing higher fees permitted for the limited time set forth by the Regulation. To expose them to the risk of still higher fees, or premature franchise renegotiation (and initial certification by the FCC[12]) or of even litigation costs is a consequence which the FCC might rightfully wish to avoid in the public interest. Thus, we agree with the FCC that the cable operators do have certain "equities involved in (their) justifiable reliance on specific franchise terms negotiated before (they were) placed on notice of the . . . 1972 (regulation)." NYSCCT Reconsideration, supra, 62 FCC2d at 978. See also CATV of Rockford, Inc., 38 FCC2d 10, 15 (1972), reconsideration denied, 40 FCC2d 493 (1973) (permitting grandfathering of pre-1972 franchised CTV systems in substantial compliance with FCC rules even though they had not gone into operation because of equity involved in "run(ning) the gamut of the franchising process . . . ").
 
 
 14
 In short, common sense, the purposes of the Regulation and its grandfather clause, the practical consequences of the competing interpretations and the equities as we discern them all bespeak the reasonableness of the FCC's interpretation. That interpretation has not been shown to be inconsistent with other FCC or judicial interpretations of grandfather clauses. See, e. g., Crescent Express Lines, Inc. v. United States, 320 U.S. 401, 64 S.Ct. 167, 88 L.Ed. 127 (1943) (grandfathered carriers not given power to change quality of service). The interpretation has been adhered to in a rulemaking procedure in which the views of the industry, communities, and the public as a whole were aired. See text accompanying note 4 supra. While neither that proceeding nor the interpretation given below bind us, we are persuaded that, on balance, the FCC interpretation is reasonable[13] and comports with the public interest, to which the agency must in the first instance conform.
 
 
 15
 Petition to review denied.
 
 FRIENDLY, Circuit Judge, dissenting:
 
 16
 The question here is a narrow one. Since the decision under review the FCC has engaged in further rulemaking under 5 U.S.C. § 553 and has dealt with the problem in a manner noted below. In the Matter of Amendment of Subparts B and C of Part 76 of the Commission's Rules Pertaining to Applications for Certificates of Compliance and Federal-State/Local Regulatory Relationships, Docket 21002, 41 Pike & Fischer RR2d 885 (1977). The controversy is confined to the period between March 31, 1972 and November 7, 1977, the effective date of the amendments.
 
 
 17
 While I would be the last to suggest that an administrative agency must always follow the strict letter of its own regulation, we have not quite reached the Humpty Dumpty era where a word "means just what I choose it to mean, neither more nor less." There can be no fair doubt of the meaning of the grandfather clause, 47 C.F.R. § 76.31(b), quoted in footnote 2 to Judge Oakes' opinion, as a matter of ordinary English speech. The clause "grandfathered" existing systems, not simply existing rates.[1] Still I would not insist on the letter if some city sought to avail itself of the grandfather clause in a manner clearly contrary to its spirit, e. g., by doubling or tripling the franchise fee assuming that this would not bring an end to the franchise or to the grandfather protection as the majority believe it well might. See 46 F.C.C.2d 175, 197 (1974). The instant problem is not of that sort at all. It has arisen from what the majority concedes to have been a development about which the Commission simply had not thought, to wit, the advent of state in addition to local regulation of certain cable television franchises and the concomitant desire of the legislators that the cost of the state regulation should be borne by the cable television industry, which can pass such costs on to its customers, rather than by all the citizenry of New York, most of whom have neither interest in nor ability to afford this service. These modest regulatory charges, limited by New York to the minimum necessary to cover the costs of regulation, and in no case to exceed 2% Of gross annual receipts, were not the sort of exaction against which the Commission properly wished to guard. Rather they are precisely of the sort for which the grandfathering provisions were designed to provide "flexibility," see note 1 supra. As the majority says, "(t)he broad purpose of the franchise fee limitation was to check rising fees that were wholly unreasonable because they bore no relation to the costs of regulation." Since the New York State Commission's are precisely related to such costs, I see no sufficient reason for not holding the Commission to what it clearly said, rather than forcing the New York Commission into time-consuming and expensive litigation with municipalities on the issue of who has the prior claim to the permitted fees, an issue which if determined adversely to the Commission will leave the burden of regulatory costs on New York taxpayers generally rather than on the cable television companies and their customers.[2] The Commission noted in its recent rulemaking that "the growth of pay cable during the past few years has been robust," para. 70 & n. 22, with the number of subscribers increasing a hundredfold in the period between March 1973 and June 1976; the intervenors will not perish if they are required to pay for the important functions with which the New York Commission has been charged, see N.Y. Executive Law, §§ 815, 822, 824, 825, 826, as the FCC grandfather regulation so plainly directed. Cf. Amendment of Subparts B and C, supra, 41 Pike & Fischer RR2d at 917 (J. R. Fogarty, Comm'r, concurring in part, dissenting in part).
 
 
 18
 The argument in favor of reading the regulation to mean what it says is strengthened by the ease with which the Commission could have changed it. See Note, Violations by Agencies of Their Own Regulations, 87 Harv.L.Rev. 629, 648-49 (1974). In contrast to a statute, where time pressures and other factors bearing upon legislators may render amendment a tedious process, the Commission, if dissatisfied with its grandfather clause, could readily have initiated a rulemaking proceeding under 5 U.S.C. § 553. When it ultimately did this, on a broader scale, it learned something about the grandfather provision just what notice and comment rulemaking is supposed to accomplish. Although adhering to the general framework of the previous fee regulation, the FCC made two changes which may greatly assist the New York Commission in its efforts to make this industry pay for regulatory costs. The FCC was convinced, para. 69, "that franchising authorities do in fact have a regulatory involvement with pay cable and similar auxiliary services that justifies expanding the franchise fee base to include gross revenues derived from all cable services," rather than the payments from subscribers alone to which its previous regulation was limited. Also, in contrast to the discouraging statement about its waiver policy contained in its earlier report, 46 F.C.C.2d at 207, which is quoted in fn. 9 to the majority opinion, the FCC now announced, para. 59, "we are confident that our waiver processes can deal adequately with unusual cases." Hence, if the New York Commission now needs relief under the new rules something that may not be needed in the future since, as we were told at argument, with start-up costs now having been covered and with cable revenues greatly increased, there was a likelihood of decrease in the expense of regulation as a percentage of revenues there is a fair prospect New York can get this. For the past, matters should be left as the grandfather clause said they were to be.
 
 
 19
 I would grant the petition to review.
 
 
 
 [1]
 Jurisdiction exists under 47 U.S.C. § 402(a) and 28 U.S.C. § 2342(1). Venue is properly laid pursuant to 28 U.S.C. § 2343
 
 
 [2]
 It provides in pertinent part:
 Franchise fees shall be no more than 3 percent of the franchisee's gross subscriber revenues per year from cable television operations in the community (including all forms of consideration, such as initial lump sum payments). If the franchise fee is in the range of 3 to 5 percent of such revenues, the fee shall be approved by the Commission if reasonable upon showings: (i) by the franchisee, that it will not interfere with the effectuation of federal regulatory goals in the field of cable television, and (ii) by the franchising authority, that it is appropriate in light of the planned local regulatory program. With respect to a cable television system that was in operation prior to March 31, 1972, the provisions of this paragraph shall not be effective until the end of a system's current franchise period, or March 31, 1977, whichever occurs first.
 
 
 [47]
 C.F.R. § 76.31(b) (1976)
 
 
 [3]
 The termination date of the grandfather period as originally established by the Regulation was the earlier of the grandfathered system's current franchise period or March 31, 1977. Id
 
 
 [4]
 The proceeding also extended the grandfather period from five to fifteen years. Thus a higher combined fee may be imposed on grandfathered systems for fifteen years or until the end of the current franchise period, whichever occurs first. 41 Pike & Fischer RR2d 885, 887 (Sept. 30, 1977) (No. 21002). In addition, the fee base was broadened to include revenues from cable services as a whole, not simply from subscribers' payments. Id. See note 10 & accompanying text infra
 
 
 [5]
 See Cable Television Report & Order, 36 FCC2d 143, 147 (hereinafter CTV Report ), reconsideration granted in part, 36 FCC2d 326 (1972) (hereinafter CTV Report Reconsideration ); Clarification of the Cable Television Rules, 46 FCC2d 175 (1974) (hereinafter Clarification ); 47 C.F.R. § 76.1 (1976). The FCC has asserted jurisdiction over CTV since at least 1966. See Second Report and Order, 2 FCC2d 725 (1966); Botein, CATV Regulation: A Jumble of Jurisdictions, 45 N.Y.U.L.Rev. 816, 826 (1970)
 
 
 [6]
 The need to balance federal goals and state needs was subsequently reaffirmed by the FCC in its recent rulemaking proceeding. The FCC noted that "nothing in (its) experience under (the Regulation), nor in the comments submitted . . . has eroded the reasonableness of the underlying balance and policy objective" and that "a majority of local governments filing comments . . . favored retention of the basic fee limitation. . . . " 41 Pike & Fischer RR2d at 904
 
 
 [7]
 The FCC has expressed its concern with "(t)he use of the franchise fee mechanism as a revenue raising device." Clarification, supra, 46 FCC2d at 201
 
 
 [8]
 The termination of the grandfather clause after a given number of years or the expiration of the preexisting franchise, whichever occurs first, notes 2-4 supra, reflects the aim of not disturbing existing franchises
 
 
 [9]
 Petitioner argues that the availability of the waiver provision is illusory in view of the FCC's statement in Paragraph 120 of its Clarification, supra. 46 FCC2d at 207: "It is unlikely that we will allow waivers for any proposal that exceeds a total of five percent for regulatory and non-regulatory purposes." But this statement of the FCC's waiver policy clearly does not preclude a waiver when fees for regulatory purposes alone exceed 5%, and the FCC has so stated in its recent rulemaking proceeding. 41 Pike & Fischer RR2d at 905
 
 
 [10]
 See 41 Pike & Fischer RR2d at 887, 910-11 n. 27
 
 
 [11]
 Clarification, supra, 46 FCC2d at 197
 
 
 [12]
 "Any . . . substantial change (in franchise fees) we consider to effectively terminate the existing franchise and that termination (or in effect the granting of a new franchise) requires recertification (or certification in the first instance on grandfathered franchises)." Id
 
 
 [13]
 See INS v. Stanisic, 395 U.S. 62, 72, 89 S.Ct. 1519, 23 L.Ed.2d 101 (1969) (administrative interpretation controls when interpretation is not clearly wrong or inconsistent with regulation, citing Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945))
 
 
 [1]
 If there were any doubt, this would be removed by P 187 of the Cable Television Report and Order, 36 F.C.C.2d 143, 210 (1972):
 The grandfathering provisions of our rules with respect to franchise standards seek to achieve a large measure of flexibility. An existing cable system will be required to certify within five years of the effective date of these rules or on renewal of its franchise, whichever comes first, that its franchise meets the requirements of the rules. This deferral should relieve both cable systems and local authorities of whatever minor dislocations our rules might otherwise cause.
 
 
 [2]
 This burden will fall on the taxpayers at precisely the time the FCC has shifted most of the responsibility for regulating cable television back to state and local governments. See Amendment of Subparts B and C, supra, 41 Pike & Fischer RR2d at 897, 899, 900